CHARLES M. PALMER and Others, Copartners Doing Business under the Firm Name and Style of PALMER, DEWITT & PALMER, Respondents, v. NEW YORK HERALD COMPANY, Appellant.*

First Department, February 14, 1930.

---

* Appeal dismissed, in part, 254 N. Y. ——.

*Joseph H. Choate, Jr.,* of counsel [*Thomas Garrett, Jr*, and *James A. Sweet* with him on the brief; *Davis, Polk, Wardwell, Gardiner & Reed,* attorneys], for the appellant.

*W. Randolph Montgomery* of counsel [*Milo O. Bennett* and *Allen S. Wrenn* with him on the brief; *Gregory, Stewart & Montgomery,* attorneys], for the respondents.

McAvoy, J. Judgment was entered on a directed verdict for more than $34,000 in favor of the plaintiffs, who are assignees of one John Glass, who sued the defendant New York Herald Company on a contract of employment of Glass, who is now deceased, by which the company, it is asserted, engaged Glass under such contract for three years' service as its western advertising representative.

The alleged contract provided for a commission of ten per cent of the net advertising produced by proper representation of the defendant in the territory which was designated. The contract went into operation January 1, 1919. In January, 1920, the executors of the estate of James Gordon Bennett, which owned all the stock of the Herald Company, contracted to sell the stock to Frank Munsey, free of all contracts. On January 20, 1920, the manager of the company wrote to Mr. Robert W. Candler, who was an officer and director of the Herald Company and counsel of the Bennett estate, respecting this Glass contract, and said that the arrangement or contract was for three years, and would not be accepted by Munsey; that it should be terminated immediately. Thereupon Glass was discharged.

The complaint in the case sets out two causes of action; one for the balance of unpaid commissions earned during the year in which the employment continued down to the discharge, and the second is for damages resulting from the breach of the contract through its repudiation and the loss of earnings thus arising during the balance of the term.

When defendant's case closed, counsel on both sides moved for the direction of a verdict. The court directed a verdict for the plaintiffs for $3,374.13, including interest, on the first cause, and $30,709.93, including interest, on the second cause. It is from the judgment, with interest and with costs, aggregating $34,275.68, that defendant appeals. Leave had been asked prior to the direction by defendant to go to the jury on all the questions.

The errors of which the appellant complains are:

(1) The direction of a verdict by the court on the question of the authority of one DeWitt to make this contract with Glass.

(2) The finding by the court that the letter of DeWitt was

a contract binding the defendant and binding Glass, and holding that the terms made therein for the defendant were not void for want of mutuality.

(3) The direction of a verdict on the first cause of action for the amount of commissions actually earned, because no proof was offered to show that any advertising was produced by Glass, as required by the alleged contract.

(4) That the court erred in taking from the jury the question of damages on the second cause of action, which direction was for the entire sum which Glass would have received each day, an amount equal to the daily average on his previous commissions, including the unpaid commissions set forth in the first cause.

The prime contention of the defendant is that there was no authority, express or implied, in the advertising manager, DeWitt, to make such a contract as the one in suit, because the circumstances following appeared in proof as to the conduct of the business which negatived the notion of a right to make the arrangement. That prior to the time of Bennett's death he had conducted this company as a one man corporation. He had committees in charge of various branches of the business, but their principal function was to furnish information, and no important action was taken during his lifetime without his personal approval. There was no independent authority exercised even though Bennett was abroad most of the time, and his board of directors even acted only on cable instructions. He exercised complete control over every detail of his three newspapers. It is claimed that after his death Mr. Candler, the counsel for the company for many years and a surviving director, called a meeting of the board of directors and resolutions were adopted and communicated to the staff, to the effect that the publication of the papers was to be continued under the supervision of the board of directors, and that a further notice was sent to the heads of all departments instructing them to refer all matters of importance to the board. The notice read that until further notice the board of directors must receive reports on all matters out of the ordinary routine that occurred during the day's work, " in connection with any of the details of your department or subdepartments under your jurisdiction. You will also acquaint the board with such suggestions for improvements or changes as may seem to you proper."

Candler also orally instructed all heads of departments that no contracts were to be made, no commitments or action taken, or news matter printed which might create any liability against the company without referring the matter to him. He made a practice of spending several hours daily at the office of the defendant, where

he was in constant touch with the business, and held frequent conferences with the various department heads. He was also in touch with the executors of Bennett's will, and advised with them in respect to the business of defendant. He was one of the persons whose signatures were required on checks of defendant drawn on one of defendant's accounts with the Guaranty Trust Company. There were two bank accounts, one in the Chemical National Bank and the other in the Guaranty Trust Company. From the Chemical account all current weekly expenses and weekly salaries were paid. At the end of the week the account in the Chemical Bank in excess of $5,000 was withdrawn and deposited in the Guaranty Trust Company account, and from that account funds could only be drawn by the signature of the treasurer, and by the signature of Colonel Jay, or Flamen B. Candler, or Mr. Egerton L. Winthrop, or Mr. Robert W. Candler.

At the time of Bennett's death, and during the time when the events upon which plantiffs rely occurred, Candler's signature was necessary on all checks from this account, all the other parties having died. No moneys could be withdrawn from this account without Robert Candler's signature, and from this account all payments other than weekly expenses and weekly salaries were to be paid. Candler signed no checks to either DeWitt or Glass, and DeWitt and Glass received compensation for their services until January, 1920, when Candler and the executors, as an incident to the sale to Munsey, first learned of the alleged contracts and their terms, and thereupon repudiated them and discharged both plaintiff DeWitt and plaintiff's assignor, Glass.

Candler knew DeWitt was working for the defendant, but did not know that he claimed to have a contract, or that Glass was working for the defendant at all. These things it is asserted show a concealment which belied the belief alleged in the efficacy of plaintiff's contract to impose a liability on defendant.

Plaintiff showed, however, these considerations in his favor: That on May 15, 1918, the day after Bennett's death, three members of the board met and passed a resolution to the effect that the publication of the *Herald* and *Telegram* would be continued under the direction and supervision of the present board. Under the by-laws there was a provision that details of the business and affairs of the company should be managed by committees to be appointed by the board of directors, which committees should make reports to the president of the company and also to the board. Members of the committee were not required to be members of the board.

On June 3, 1918, a second meeting of the board appointed an

executive committee, which was to consist of Mr. Kelley, Mr. Ohl and Mr. Flaherty, who were to have general oversight and supervision of the affairs of the company in the absence of the directors, and to report to the board from time to time as such committee might deem proper, or as the board might require.

This committee, composed of Kelley, Flaherty and Ohl, consisted of the only director actively engaged in the business and an editor, the general manager who had worked up to that position from his occupancy of a post in the company for many years, and another who was one of the chief editors of the paper. This executive committee could not be considered as occupying the relatively innocuous powers of those under Bennett, who allowed such committees to do nothing except on his direction.

The committee returned a week later with certain recommendations for rehabilitating the business. It appears that the committee's report showed the affairs of the company to be in serious condition, and that it appeared necessary to obtain a man of " ability, strength and resource " as advertising manager. They adopted a resolution putting Mr. Ohl in charge of the New York *Herald,* with power to make changes in the staff, after consultation with the executive committee. No restrictions were put on Ohl and the committee with respect to the terms under which the new man would be engaged. This resolution does not require a report to the board. The board adjourned and did not meet again until November 18, 1918. At that time Ohl and Flaherty became directors, which was the first meeting held after Bennett's will was probated. It is claimed that because DeWitt knew of the limits of the actual authority of the general manager of the *Herald,* his contract could not have been regarded by him as binding on the company, and that the Glass contract, which was made by DeWitt, was known to Glass to be without that authority which would be binding on a corporation conducted as this was.

The Glass contract was in the form of a letter authorizing him to represent the *Herald, Telegram* and European edition of the *Herald* in the western territory which was described " for the purpose of this agreement shall be west of Pittsburgh and Buffalo and east of Rocky Mountains, and north of Memphis." Compensation was described as " for proper representation of these papers in this territory you shall receive a compensation of 10% of the net advertising produced for the next three years, beginning January 1, 1919." It was also set out that there were certain advertisers who put their business in through agencies in that territory, and these accounts were to be transferred to Glass' credit and likewise all similar cases. It was set out that if he (Glass)

opened an office on the Pacific coast, they would transfer the representation of these papers to that office in that territory; and if he opened one in the south they would do likewise.

Glass wrote on one copy of this letter, " Accepted," and signed his name, and a copy was then sent to the treasurer of the defendant, who was not a director, and a copy was also sent to the executive committee. This letter arrangement is the basis of plaintiffs' claim to damages for termination thereof prior to expiry.

Defendant argues that the contract in suit is void for want of mutuality but such view does not seem to be sustained by the nature of this arrangement. DeWitt in his capacity as advertising manager of the company prepared the letter, Glass accepted it by signing one of the copies in the lower left-hand corner, " Accepted, John Glass," and after making the agreement the parties actually operated under it from January 1, 1919, to January 16, 1920, when defendant sold its stock to Mr. Munsey. Mr. Munsey declined to accept that contract and defendant endeavored to cancel it. The contention that it never was a valid contract, that it did not obligate Glass to do anything, and was void *ab initio* for want of mutuality, is not supported either by the nature of the document or any modern construction of it in view of the latter-day liberality of inference of implied obligations under similar pacts. The express provisions of the letter, and the necessary implications from the language employed, and the signature by the party to whom it is addressed, with the word " accepted " appended, show a mutual agreement binding both parties.

Glass was bound by an implicit promise on his part to give proper representation in his territory to the defendant's newspaper business. Proper representation could be defined as a service which would be deemed a reasonable carrying on of the trade or business in which the parties were engaged. While it was not an exclusive service contract and did not so provide, it was such a service as persons in the newspaper trade understood.

We think that under all the rules applicable to the construction of a letter of this character, it must be held that the contract in suit was not void for lack of mutuality.

We think, too, that it must be held besides that the contract was authorized and ratified, and that the defendant corporation is bound thereby and could not deny validity.

The contract does not depend entirely upon DeWitt's independent authority. Before it was made, DeWitt communicated with the members of the executive committee about it, and its terms, and had full approval of them to sign it, and signed it with their approval.

None of the executive committee was called to contradict DeWitt in this respect, although he testified at least twice in the trial.

Flaherty, one of the committee and general manager, was available at the time of the trial, and if this statement of DeWitt's report to the committee was untrue, he might have denied it.

Besides, the receipt of a letter of December 6, 1918, notifying the executive committee that DeWitt had appointed Glass as agreed upon with the committee, could have been denied by Flaherty.

It appears in our judgment that the executive committee itself had power, express or implied, to authorize DeWitt to execute the contract for the company, or that they had been held out as possessing such power. But, whether or not the committee had power to authorize DeWitt to make the contract with Glass, it would seem to be obvious that the contract has been ratified.

The Glass contract was in operation for more than a year, and there is nothing to indicate that any attempt would have been made to cancel it had it not been for the sale of the *Herald* and *Telegram* to Mr. Munsey.

The only reason assigned in the proof is the letter of Flaherty to Candler, on January 20, 1920, in which he states that the contract being for a period of three years will not be accepted by Mr. Munsey and should be terminated.

During all this period the *Herald* received the benefit of the contract, and cannot now be heard to deny its execution as unauthorized.

Even though the executive committee's knowledge could not be imputed to the board, the board should be charged with notice, because copies of the Glass contract were filed in the office of the treasurer of the company, the accounting department and the advertising department.

It is our view, therefore, that the board is charged with notice through the executive committee, and if they were under no duty to report, unless a report was requested, the contract was binding without imputing notice to the board.

But we find that the judgment must be reversed in part because a correct rule of damages was not applied in this case as to the second cause. While we conclude that the damages with respect to commissions actually earned were properly directed, there was no direct proof that the advertising resulted from contracts produced by Glass. However, it must be presumed that payments made to him by the defendant were made in accordance with the agreement, and, therefore, represented advertising produced within the meaning of the contract. This must be presumed specifically with respect to the balance of $2,176.86, which was calculated by defend-

ant after Glass' discharge, and after the subject of the claims under the contract became a matter of controversy. This balance was calculated after the terms of the contract became known and the sum thus found in conclusive on defendant.

With respect to the direction of a verdict on the second cause of action, for damages for the unexpired term of the contract, we find that there was error in such direction. The sole basis on which the amount of the directed verdict was computed was the conjecture that Glass' commissions after the termination of the contract would have continued as based on the same amount of business as had been done during his first year. There was no evidence as to the conditions after the unexpired time, i. e., whether they were the same, or more or less favorable. Nothing was shown as to whether the trend of Glass' sales was upward or downward. The measure of damages is the measure of value of the contract to the plaintiffs. They could not recover the entire gross receipts, which if the contract had been performed would have been taken in by Glass. They can be given the gross receipts, less the expenses to which he would have been put in earning them. Besides, the actual loss to Glass was not the full amount which he might have received from the *Herald*, but that sum less the other earnings which the time and facilities of his office left free by the absence of this *Herald* engagement enabled him to make from other clients.

The question of whether or not there was diminution in desirability of the *Herald* and *Telegram* as advertising media, a falling off in the use of various accounts of advertising in the territory supplied, a likelihood of depreciation in the various trades served, a possibility of loss of clients, were all matters of jury risk, which should have been left to that arm of the court to solve the amount of damages for the unexpired term of the contract.

The judgment and order appealed from should, therefore, be reversed, without costs of this appeal, and a judgment directed in favor of the plaintiffs upon the first cause of action in the sum of $3,374.13, with interest thereon from the 17th day of March, 1929, and costs; and the action severed and a new trial ordered as to the second cause of action.

DOWLING, P. J., MERRELL, FINCH and PROSKAUER, JJ., concur.

Judgment and order reversed, without costs of this appeal, and judgment directed in favor of plaintiffs upon the first cause of action in the sum of $3,374.13, with interest thereon from the 17th day of March, 1929, and costs; and the action severed and a new trial ordered as to the second cause of action. Settle order on notice.