Marvin STERN, Plaintiff-Appellee and Cross-Appellant,

v.

SATRA CORPORATION and Satra Consultant Corporation, Defendants-Appellants and Cross-Appellees.

Nos. 832, 1360, Dockets 75–7649, 75–7665.

United States Court of Appeals, Second Circuit.

Argued May 26, 1976.

Decided July 6, 1976.

Alvin K. Hellerstein, New York City (Stroock & Stroock & Lavan, Vivienne W. Nearing, New York City, of counsel), for plaintiff-appellee and cross-appellant.

Albert M. Appel, Henry W. Simon, Jr., Fort Worth, Tex. (Webster & Sheffield, Thomas W. Hill, Jr., New York City, of counsel), for defendants-appellants and cross-appellees.

Before HAYS, MULLIGAN and MESKILL, Circuit Judges.

MULLIGAN, Circuit Judge:

In January 1972, Marvin Stern (Stern), a resident of the State of California, brought this diversity action in the United States District Court for the Southern District of New York against two New York corporations, Satra Corporation and Satra Consultant Corporation (jointly referred to as Satra). The complaint sought a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* determining the rights and relationships between the parties under an agreement entered into on or about September 1, 1971. Stern also sought damages and an accounting. Satra defended on the grounds that there was no valid and binding agreement because of a failure of the parties to reach a meeting of the minds on a material term of the agreement; that if an agreement was entered into, it was induced by Stern's material misrepresentations which entitled Satra to rescind; and finally, that there was a failure of consideration. The issue of liability was tried before a jury which found in favor of the plaintiff Stern. The issue of damages was reserved for determination by District Judge Morris E. Lasker, whose decision constituting findings of fact and conclusions of law was rendered on January 17, 1975 and more fully clarified on June 19 and 27, September 8, and October 2, 1975. Final judgment awarding Stern $131,862.86, computed according to a schedule which was made part of the judgment, was entered on October 20, 1975. Satra filed its notice of appeal on November 17, 1975 and Stern filed his notice of cross-appeal on November 25, 1975. We affirm the judgment below in all respects.

I

The plaintiff Stern, an engineer with a doctorate in mathematics, has held executive positions with a number of corporations and served as a Deputy Director in the Office of Secretary of Defense under Robert McNamara. Satra is in the business of facilitating commercial and financial arrangements for major American corporations wishing to do business in the Soviet Union. Stern was initially retained by Ara Oztemel, President of Satra, as a consultant on a $500 per diem fee basis to analyze the effectiveness of Satra's representation in Washington, and to assist Satra in obtaining an export license from the Department of Commerce in connection with a major Soviet truck manufacturing project on the Kama River. Stern represented to Oztemel that he might also be able to secure IBM and Stromberg-Carlson as Satra clients, and thereafter began to negotiate with IBM on Satra's behalf. At the same time, Stern and Satra decided to broaden their existing relationship. After initial discussions and draft agreements, Satra prepared a written proposal for Stern dated August 31, 1971 providing two alternatives, either one of which was acceptable to Satra.

The first option offered Stern was that he receive fifty percent of the gross revenues received from IBM and Stromberg-Carlson by Satra, after deduction of ex-

penses on an annual basis as per an attached schedule. The second proposed an advance of $6,250 per month against a minimum of $50,000 of net profits plus thirty percent of any additional net profits. On the next day, Stern selected the first option, subject to the clarifying condition specified in the addendum at the end of the agreement written and signed by Oztemel at Stern's insistence: "In alternate one (I) any retainers received will be divided 50–50. Other income as above schedule." The agreement in issue as finalized is set forth in the margin.[1]

On September 22, 1971, as the result of Stern's negotiations on behalf of Satra, Satra and IBM executed a contract which provided that 1) for its services to IBM, Satra was to receive a commission of three-and-one-half percent of IBM sales of data processing machines to or in the USSR and 2) "upon execution of this Agreement the Company [IBM] shall advance a retainer to the Consultant [Satra] of $25,000.00, and ninety days thereafter an additional $25,-000.00. These advances shall be charged against future commissions." IBM made the two $25,000 payments to Satra. Satra paid half of the first installment to Stern, without any deduction or reservation. Satra refused to pay Stern any part of the second $25,000 or any other money received by Satra from IBM, which Stern claims to be due and owing by reason of the September 1, 1971 agreement.

According to Satra, the romance with Stern soured when James Giffen, President of Satra Consultant Corporation, learned from Ralph Stafford, director of IBM's Eastern European operations, at a dinner conversation in Leningrad in October 1971 that Stern did not influence the IBM decision to enter the Soviet market, that he did not persuade IBM to utilize Satra's services and that he was not "close" to IBM. Giffen reported this conversation to Oztemel, and Stafford repeated his statements to Oztemel at a meeting in London. On November 16, 1971, Oztemel met with Stern in New York and, according to Oztemel's testimony, advised Stern that he had been misled as to Stern's influence with IBM and that the relationship had to terminate. Oztemel however recognized that Stern had made the IBM deal possible and offered to pay him as a fee $100,000 or the usual finder's fee percentage, i. e., five percent of the first million, four percent of the second million and so on for the life of the contract that Stern had arranged with IBM. Stern's version of the conversation was that Oztemel had advised him that the contract was unworkable and would have to be revised for both commercial and legal reasons without further explication. Since no further payments were made to Stern, this litigation ensued.

In June 1973, after this suit had been commenced, Satra and IBM entered into a new agreement and Stern has further

1. "A. No financing by Satra.

"B. Your compensation will be 50 percent of gross revenues received from IBM and Stromberg-Carlson by Satra after deduction of expenses on an annual basis as per attached schedule. These commissions will be payable for all amounts accrued by Satra during the term of any agreement signed by Satra with IBM and S–C plus all commissions that may be earned from sales then under negotiation. Commissions will also be paid during the term of any renewal of such agreement provided Stern continues to devote such time necessary to service the agreement. These commissions will be paid quarterly after an amount equal to expenses has been recouped in each year.

"C. All expenses for the project will be advanced by Satra to be recouped out of earnings, if any, including your incidental expenses which will not include amounts attributable to

your commuting from Los Angeles to New York. All foreign travel by you, in connection with this venture, must be approved by Satra.

"D. All personnel to be hired or assigned by Satra to the project will be Satra's sole responsibility.

**SCHEDULE**

| Incremental Annual Revenue | | Incremental Annual Expenses |
|---|---|---|
| $ 250,000 | .............. | $100,000 |
| $ 250,000 | .............. | 50,000 |
| $ 250,000 | .............. | 25,000 |
| $ 250,000 | .............. | 15,000 |
| $1,000,000 | .............. | 10,000 |

In alternate one (I) any retainers received will be divided 50–50. Other income as above schedule."

claimed that he is entitled to share in revenues Satra has or will receive under both the 1971 and 1973 agreements.

## II

On this appeal Satra claims that it was induced to enter into the agreement with Stern because of Stern's misrepresentations concerning his influence with IBM and the necessity of his participating in any relationship between Satra and IBM. In addition to requesting that the jury be instructed on the New York law of rescission based on fraudulent misrepresentation, which charge was given, Satra requested Judge Lasker to charge the jury that Satra was entitled to rescind its agreement with Stern even if he made the representations without an intent to deceive—that an innocent misrepresentation of fact, if material, would permit Satra to rescind its agreement. That request was refused.

We agree with Satra that the New York law, which is concededly applicable here, is well settled that an innocent misrepresentation of a material fact permits rescission even though made without an intent to deceive. *Seneca Wire and Manufacturing Co. v. A. B. Leach & Co.,* 247 N.Y. 1, 159 N.E. 700 (1928); *Bloomquist v. Farson,* 222 N.Y. 375, 118 N.E. 855 (1918). Both of these cases involved misrepresentations of objective fact. In *Seneca* there was a representation to a purchaser that application had been made to list certain notes on the Stock Exchange, when in fact none had been made. In *Bloomquist* a representation was made to a prospective purchaser of irrigation bonds that the irrigation work had been completed and that water was in the reservoir; in fact only sixty percent of the work was completed, and there was no water in the reservoir. On familiar equity principles rescission was appropriate whether the representation of fact was either mistaken or fraudulently made. Restatement of Contract § 476 (1932).

However, it is also well understood that statements of opinion are treated differently. Restatement of Contracts § 474 (1932);

12 S. Williston, Contracts § 1491 (3d ed. 1970). Thus,

> Statements that things are "good," "valuable," "large," or "strong," necessarily involve an exercise of individual judgment, and even though made absolutely the hearer must know this; but the boundaries of quality asserted by such statements, though indeterminable with exactness, cannot be stretched indefinitely. Where no reasonable man making such a statement could by any possibility think the asserted quality existed, as assertion of its existence, if made with consciousness of the falsity of the statement, is fraudulent.

Restatement of Contracts § 474, Comment c.

Stern's estimates of his influence with IBM, his ability to make the deal for Satra, and the necessity of his retention to acquire IBM as a customer in our view fall into the category of an individual judgment or opinion which would not provide a basis for rescission unless made in bad faith, as was charged by the court below. As Judge Learned Hand indicated in *Taylor v. Burr Printing Co.,* 26 F.2d 331, 334 (2d Cir.), cert. denied, 278 U.S. 641, 49 S.Ct. 36, 73 L.Ed. 556 (1928):

> The distinction depends upon how far the utterance implicitly presupposes the use of some subjective standard by the utterer. Value, quality, fitness, success, are usually understood as meaning no more than that the objects conform with the declarant's individual yardstick in such matters. While he may make it clear that his reference is to some commonly accepted measure, ordinarily he does not, and his hearer takes it for more at his peril.
>
> Utterances such as those now at bar are in this class. What one man would call a success another might not; there is no certain objective standard to which reference is impliedly made.

This comment is applicable here. The extent to which Stern could bring influence upon IBM is obviously not capable

of objective calibration. Satra relies upon *Allstate Ins. Co. v. Winnemore,* 413 F.2d 858 (5th Cir. 1969) where an applicant for total disability income protection insurance falsely represented the amount of his income. The court, applying Florida law, properly held that the misrepresentation was a basis for rescission of the policy whether innocently or fraudulently made. Clearly, the applicant was there able to determine the amount of his income; it was a fact within his knowledge. The proper distinction was made in *Sommer v. Guardian Life Ins. Co. of America,* 281 N.Y. 508, 24 N.E.2d 308 (1939) where an applicant for life insurance represented that he was in good health. In fact he had a coronary condition which was unknown to him. While acknowledging that in New York an innocent misrepresentation, if material, constituted a defense to the insurer, the court held that statements of good health or freedom from disease "are usually construed merely as representations and statements of opinion, since it is plain that the insured or applicant cannot speak with positive knowledge." 281 N.Y. at 514–15, 24 N.E.2d at 311. The court further indicated that the insurance company undoubtedly knew that the applicant could only state his own opinion and that the subject was not susceptible of completely objective appraisal or definition. The statements by Stern as to his ability to influence IBM are in the same category. Stern could not be positive about the extent of his influence and Satra should have realized this. Certainly Satra was not a naive or unsophisticated participant in the field of international trade and commerce apt to be beguiled or gulled by Stern's asserted contacts. Moreover, the contract with IBM was in fact procured by him and Satra expressed a willingness to pay substantial amounts in recognition of his efforts, albeit not the sum agreed upon under the September 1 agreement. We hold therefore that a representation by Stern of his ability to influence IBM constituted merely an opinion or subjective appraisal which would constitute a basis for rescission only if it was made in bad faith, and that therefore the requested charge was properly denied.[2]

### III

Appellant also contends that Judge Lasker improperly construed the September 1 agreement with respect to the method by which deductions of expenses were to be made from revenues received by Satra from IBM prior to their distribution to Stern. Judge Lasker found that the deductions of expenses pursuant to the schedule (see n.1 *supra*) were intended to be non-cumulative and were to be prorated commencing with the first revenues received. We cannot agree that the court committed error in resorting to the testimony of the parties in an effort to clarify their intent. *M. O'Neil Supply Co. v. Petroleum Heat & Power Co.,* 280 N.Y. 50, 55–56, 19 N.E.2d 676, 679 (1939); *Mister Filters, Inc. v. Weber Environmental Systems,* 44 A.D.2d 639, 353 N.Y. S.2d 835, 837 (3d Dept. 1974). The agreement was drafted by Satra, not Stern, and its language is hardly as clear as a mountain lake in springtime. Judge Lasker credited the testimony of Stern which he

---

2. Satra argues that the court improperly instructed the jury that a willful misrepresentation of an opinion could not constitute an intention to deceive. In a colloquy with a juror Judge Lasker stated:

> I believe that you understand . . . the difference between deliberately telling somebody an untruth or merely expressing an opinion which you don't believe—how can I put it?—in which there is no deliberate intention to misrepresent.

The comments may be ambiguous, although it seems most likely that the last phrase ("in which there is no deliberate intention to misrepresent") was intended to modify "opinion" and to correct the prior phrase ("which you don't believe"). In any case, Judge Lasker had previously correctly charged the jury:

> If you find that Dr. Stern made a material misrepresentation knowing that the statement he made was false, you would find that *he intended to deceive Satra.* Furthermore, even if you were to find that Dr. Stern made the misrepresentation *without knowing whether it was true or false but pretending* that he had exact knowledge of the situation when he did not, you can find that he intended to deceive Satra.

(emphasis added).

characterized as "highly persuasive and [which] was unrefuted in its essentials by any defense witness." His determination of these issues cannot in any sense be characterized as clearly erroneous.

The Stern-Satra agreement of September 1, 1971 also provided for payments to Stern "during the term of any agreement signed by Satra with IBM . . ." as well as payments "during the term of any renewal of such agreement provided Stern continues to devote such time necessary to service the agreement." IBM and Satra entered into their agreement on September 22, 1971 for a five-year term. On June 26, 1973 Satra executed another agreement with IBM which provided that Satra was to receive a monthly fee of $16,667 for its administrative services plus a monthly "advance" of $9,350 against commissions to which it would have been entitled under the 1971 contract if a deal could be consummated with Intourist. The court below found that the 1973 IBM–Satra agreement constituted a renewal of the 1971 agreement so that Stern would continue to be entitled to payments pursuant to the September 1, 1971 agreement.

On appeal Satra argues that absent an identity of provisions, the second agreement cannot be considered a renewal of the first. The cases relied upon by Satra, however, *William Adam Schulz & Co. v. Realty Associates, Inc.,* 17 N.Y.S.2d 924 (Mun.Ct., Queens Cty. 1940); *Mitchnik v. Brennan,* 159 Misc. 287, 286 N.Y.S. 609 (Mun.Ct., Queens Cty. 1936), all involve real estate brokers seeking brokers' commissions on "renewal" rentals. The law in New York is distinctly settled that before the lessor is obligated to pay such commissions, the renewal must be for the same term and the same rent as the original lease, or the new lease must have been the result of services performed by the broker. We have found no New York case and none is cited holding that the rigid real property rule so enunciated is to be applied to other situations. Stern was not a broker and the agreement was not a lease. His right to compensation for "any renewal" was explic-itly conditioned—"provided Stern continues to devote such time necessary to service the agreement." The court found that Satra was expected under the 1973 agreement to perform essentially the same services as under the 1971 agreement. Under both agreements, according to the testimony of an IBM official, Satra was to provide IBM with expertise and administrative services, including office space in Moscow, arrangements for visas, transportation, appointments, conference rooms, seminars and translators. There is no contention that Stern was not willing to devote the same time to servicing the 1973 agreement.

Again we note that the contract between Stern and Satra was drafted by Satra, and should not be construed against Stern's interests. The contention that "any renewal" is limited to a carbon copy duplication is unreasonable. It would put Stern at the mercy of Satra which could renegotiate various items with IBM and thus eliminate Stern's participation. It is well understood that parties to an agreement are presumed to act reasonably in regard to it, and an interpretation which produces an absurdly harsh result is to be avoided. *Fleischman v. Furgueson,* 223 N.Y. 235, 119 N.E. 400 (1918); *Wigand v. Bachmann-Bechtel Brewing Co.,* 222 N.Y. 272, 118 N.E. 618 (1918); *River View Associates v. Sheraton Corp. of America,* 33 A.D.2d 187, 306 N.Y. S.2d 153 (1st Dept. 1969); aff'd, 27 N.Y.2d 718, 314 N.Y.S.2d 181, 262 N.E.2d 416 (1970). While Satra's responsibilities were diminished by the 1973 agreement, along with its financial return, so correspondingly were Stern's. Judge Lasker found that the 1973 agreement was intended to substitute for the 1971 arrangement and that it was so understood by the parties. Oztemel, in a letter to IBM on June 26, 1973 described it as an agreement "to replace the existing contract between our firms." We consider it to be a renewal in the context of the agreement between the parties and we refuse to construe "any renewal" in the narrow, rigid formulation which is applicable to real estate brokers seeking commissions on rental renewals.

## IV

Both Satra on its appeal and Stern on his cross-appeal urge that the district court improperly applied mitigation of damages principles below in determining Stern's recovery. Satra argues that Stern was required to spend either all of his time or so much of his time in the Satra venture that he was precluded from earning any income from other sources. Hence, Satra urges that all sums he earned or reasonably could have earned from other sources after breach should be deducted from any recovery. Stern on the other hand argues that no such sums should be utilized as an offset because he was not provided with any benefit by the breach, since he was a "self-employed professional" who could have taken on other opportunities without limitation. Judge Lasker found as a fact that Stern's obligations under his agreement with Satra would have demanded fifteen percent of his normal working time. He further found that full-time employment was available to Stern at and since the time of breach and, accordingly, he was freed by the breach to secure clients for the fifteen percent of his employable time which he would otherwise have had to devote to Satra-IBM business. The formula to determine the amounts to be paid is meticulously set forth in Judge Lasker's twenty-one-page judgment of October 14, 1975.

As Judge Lasker indicated in his opinion, it is impossible to calculate mathematically what portion of Stern's time was to be made available to Satra. Nonetheless, some estimation had to be made and we cannot term the estimated fifteen percent to be clearly erroneous.

Satra's contention that Stern was obliged to devote all or substantially all of his time to the Satra-IBM venture is not supported by the record. The contract drawn by Satra is again of no help. There is certainly no provision in it requiring Stern to devote all of his time to the venture. While Oztemel did testify that Stern had indicated at the outset of the arrangement that he would have to utilize all of his working time, there is no indication that this was a continuing obligation. Moreover, Oztemel's credibility was a matter for the trial court to determine. We further agree that the burden of going forth with proof that Stern's time was fully committed was upon Satra. *Haughey v. Belmont Quadrangle Drilling Corp.*, 284 N.Y. 136, 142, 29 N.E.2d 649 (1940). That burden was not established here. Satra argues that in negotiating the contract, Stern was insistent on receiving immediate payments so as to be able to live and therefore, inferentially, Satra was to be his sole source of livelihood. The issue is not, however, Stern's financial status at the time the contract was negotiated, but what other opportunities would exist for additional income during the course of the relationship. Satra also argues that if Stern could make some $70,000 a year working only fifteen percent of his available time, Stern's annual earning capacity would be the "staggering" sum of $465,000. However, it does not follow that all of Stern's business would be as lucrative as the IBM venture. The court below has retained jurisdiction and Stern's income tax returns are to be made available so that mitigable income can be determined.

Stern's contention that no additional working time was made available to him by the breach is frivolous. The review of the evidence by the district court is persuasive on this issue. Stern, by his own admission, was to continue to provide assistance to Satra when called upon and was expected to assist in maximizing sales and profits. Moreover, Stern was expected to spend time in Moscow. It is inconceivable that Stern, an individual with no staff or organization, could simultaneously perform unlimited services for other clients.

Stern's argument that the court below erred as a matter of law in applying mitigation principles since he is a "self-employed professional" is unpersuasive. Judge Lasker properly set forth the law of New York on this issue. As Professor McCormick has observed, the doctrine of avoiding the consequences of a breach of contract or a tort is closely akin to the doctrine that in arriving at a determination of damages for a

defendant's wrongful conduct, if any benefit or opportunity for benefit appears to have accrued to the plaintiff because of the breach, a balance must be struck between benefit and loss, and the defendant is only chargeable with the net loss. McCormick, Damages 146 (1935). The proper factual inquiry is what benefit (i. e., free time) was realized by Stern as a result of the breach. This depends upon the facts in each case and we have found no New York "rule" which would eliminate so-called "self-employed professionals" from its operation.

On the contrary, in *Palmer v. New York Herald Co.,* 228 App.Div. 176, 239 N.Y.S. 619 (1st Dept.), aff'd, 255 N.Y. 572, 175 N.E. 318 (1930), a case not cited by either party, an advertising representative engaged on a nonexclusive commission basis to obtain newspaper advertisements for the New York Herald upon breach was held to be entitled to recover the contract price "less the other earnings which the time and facilities of his office left free by the absence of this Herald engagement enabled him to make from other clients." 239 N.Y.S. at 628. In essence, Stern's argument reduces itself to the absurdity that he, as a sole entrepreneur, could handle an infinite number of clients. In sum, we conclude that Judge Lasker's findings of fact on this issue are not clearly erroneous and that he properly applied the legal principles which are governing.

## V

Under the 1973 agreement between IBM and Satra, the latter was to receive a monthly sum of $16,667 for services rendered, plus a monthly "advance" of $9,350 on payments expected to be received from the USSR subject to defeasance if the payments were not obtained. The district court held that a deduction of expenses according to the schedule in the Stern-Satra agreement was required to be made from both amounts. Stern argues that these were "retainers" under the agreement to be divided fifty-fifty without deduction of expenses. We agree with the construction of the court below that the "retainers" re-

ferred to in the Stern-Satra agreement only referred to the cash payments made by IBM at the outset of their relationship and not to periodic payments for services rendered. We note that in Stern's notice of cross-appeal, no reference was made to the denial of retainer status as to the $16,667 monthly payments. We need not decide whether Stern is precluded from raising the question on appeal since, as we have held, the court below in any event properly determined the issue.

Affirmed.