John S. SAMUELS, 3d, Carbomin Group, Inc., Carbomin International Corporation, Leckie Smokeless Coal Company and ICM Corporation, a Missouri Corporation, Plaintiffs,

v.

ELEONORA BEHEER, B. V., Defendant.

ELEONORA BEHEER, B. V., Counterclaim Plaintiff,

v.

John S. SAMUELS, 3d, Carbomin Group, Inc., Carbomin International Corporation, the United States of America, the New York State Tax Commission, People of the State of New York, City of New York, Counterclaim Defendants.

80 Civ. 2706.

United States District Court, S. D. New York.

Nov. 14, 1980.

Saxe, Bacon & Bolan, P. C., New York City, for plaintiffs and counterclaim defendants; Louis Biancone, New York City, of counsel.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for defendant and counterclaim plaintiff; Steven J. Stein, John W. Ritchie, New York City, of counsel.

John S. Martin, Jr., U. S. Atty., S.D.N.Y., New York City, for counterclaim defendant U. S.; David M. Jones, Asst. U. S. Atty., New York City, of counsel.

Robert Abrams, Atty. Gen., of the State of N. Y., New York City, for counterclaim defendants New York State Tax Commission and People of the State of New York; Alan Gitter, Asst. Atty. Gen., New York City, of counsel.

Allen G. Schwartz, Corp. Counsel, New York City, for counterclaim defendant City of New York; Jeffrey Stonehill, Asst. Corp. Counsel, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

After a careful study of the undisputed agreements, promissory notes and mortgage instruments executed by one or more of the parties to this litigation, the Court is persuaded that plaintiffs, anticipating a foreclosure suit by defendant based upon plaintiffs' default of payments of almost $3,000,-000 due under the agreements, "jumped the gun" by commencing an action in the Supreme Court of the State of New York seeking rescission of the agreements and restitution of $5,000,000 already paid to defendant pursuant to such agreements on the ground of fraud, and that its purpose was to delay the "judgment day."

The defendant, Eleonora Beheer, B.V., a Netherlands corporation ("Beheer"), removed the state action to this Court based upon diversity of citizenship.[1] Beheer then served an amended answer which, among other matters, asserted a counterclaim to foreclose a mortgage held by it on real property owned by plaintiff, John S. Samuels, 3d ("Samuels"). Plaintiffs served a reply to the counterclaim, alleging defenses of fraud, which tracked the allegations of their complaint, duress, failure of consideration, release, waiver of defaults and an agreement by defendant to refrain from foreclosure of the mortgage.

Beheer now moves pursuant to Rules 12 and 56 of the Federal Rules of Civil Procedure for an order granting summary judgment in its favor dismissing the complaint and striking plaintiffs' various defenses in reply to defendant's counterclaims. In support of its motion, Beheer filed a statement pursuant to General Rule 9(g) of the Local Rules of this Court. Plaintiffs filed a counterstatement which does not dispute the execution of the various documents, notes, security agreements, guarantees and mortgages that are the subject of the defendant's counterclaim; however, they assert, as does the complaint, that they were executed as a result of fraud practiced by Leonard Cohen ("Cohen"), now deceased, and that with respect thereto there exist genuine disputed issues of material facts. The parties having filed affidavits in support of their respective positions, this motion is deemed one for summary judgment pursuant to Rule 56. Despite the extensive and voluminous record, the issues presented to this Court are comparatively simple.

### The Parties

Plaintiff Samuels is the sole owner of the stock of plaintiff Carbomin Group, Inc. ("Group"), which is the parent corporation of plaintiff Carbomin International Corporation ("Carbomin"). Group is owner of 51% of the stock of plaintiff, Leckie Smokeless Coal Company ("Leckie"). Another plaintiff is ICM Corporation ("ICM"), of which Samuels owns 97½% of its shares. (The plaintiffs are at times hereafter referred to as "Samuels" or "Samuels group.") Samuels was engaged in the early 1970s in coal trading and in the acquisition of coal mines. The defendant herein, Beheer, prior to Cohen's death, acquired from him by assignment all of his right, title and interest under the various agreements with the plaintiffs.

### The Agreements

A chronological history of the agreements and documents which give rise to Beheer's claims against plaintiffs follows. On December 1, 1976, Group and Cohen entered into an agreement, which was amended on May 20, 1977 (the "Settlement Agreement"), whereby Samuels and Group purchased from Cohen certain shares of Leckie and Carbomin. Significantly, the preamble of the Settlement Agreement referred to the agreement of December 1, 1976, and stated that Cohen was and remained

> ... ready, willing and able to consummate the sale of the [Leckie] Shares under the Agreement [of December 1, 1976] but Buyer [Group] has failed to perform its obligations thereunder; and

> ... Carbomin and John S. Samuels, 3d have jointly and severally guaranteed the obligations of Buyer under the Agreement ... but have similarly failed to perform any and all of their obligations under the Guaranty; and

> ... in order to induce Seller [Cohen] to refrain from enforcing his legal rights and remedies against Buyer, Carbomin and Samuels arising out of said defaults, and to induce him [Cohen] to forbear in the pursuit of his legal rights and remedies in the two currently pending legal actions which he has instituted against Samuels and others ... [the parties enter into the Settlement Agreement].

1. Simultaneously with the commencement of their action in the state court, plaintiffs obtained an ex parte temporary restraining order that enjoined Beheer from taking any action to enforce its rights by reason of the alleged defaults. This order was vacated and plaintiffs' motion for a preliminary injunction was denied by a Justice of the State Supreme Court.

Pursuant to the agreement Cohen transferred the securities to Group, the purchaser; Cohen was paid $1.5 million in cash and received promissory notes aggregating $5.75 million, the balance of the purchase price. Plaintiffs, Samuels and Carbomin, jointly and severally guaranteed full and timely performance by Group of all obligations under the agreement. In addition, Samuels, as collateral security for his obligations under the guaranty, executed a mortgage in the principal sum of $500,000 (increased to $1,500,000 in December 1979, as referred to hereafter) on real property owned by him at 123 East 79th Street, New York City.

On July 31, 1977, Cohen sold to Beheer the negotiable promissory notes payable by Group. Beheer surrendered these notes to Group in exchange for new notes of identical tenor payable directly to Beheer. Thereafter, Group paid to Beheer $1,000,000 due October 31, 1977, and $2,000,000 due April 30, 1979. Interest was paid on the remaining notes until July 31, 1979, when Group defaulted. Beheer thereupon gave notice of acceleration, and declared the unpaid balance on the outstanding notes due and payable. Following the default, on December 7, 1979, Group, Samuels and Carbomin entered into a direct agreement with Beheer ("Modification Agreement"). Again, significantly, in the light of the claims of fraud now made by plaintiffs, the preamble reads in part:

> WHEREAS, Group and other parties to the Guarantees and Security Agreements are presently in default in a number of respects under the Notes, the Security Agreements and the Settlement Agreement; and

> .    .    .    .    .

> WHEREAS, Group, Carbomin and Samuels have requested that Eleonora [Beheer] forbear from exercising its remedies under the Notes, the Guarantees and the Security Agreements and release certain of the Collateral, and in consider-

ation therefor, have agreed to provide certain additional security . . . .

Under the Modification Agreement: (1) Samuels executed and delivered to Beheer an additional mortgage in the sum of $1,000,000 on the East 79th Street property, which was consolidated with the earlier $500,000 mortgage into a single mortgage and lien in the principal sum of $1,500,000, foreclosure of which is part of the relief sought by Beheer; (2) Group executed and delivered to Beheer a note guaranteed by Samuels and Carbomin in the sum of $59,-736.11, to meet the defaulted July 31, 1979 interest payment; (3) Beheer withdrew its declaration accelerating payment of outstanding notes at the time of default and surrendered liens against certain shares Carbomin and Leckie held pursuant to the May 1977 Settlement Agreement; (4) except as modified, all the earlier agreements, notes, guarantees and other agreements were continued in full force and effect, and (5) Beheer reserved all rights with respect to any future defaults. The Modification Agreement was negotiated and consummated by experienced lawyers representing the respective parties.[2]

In a matter of weeks after the execution of the Modification Agreement another default occurred. Group failed to pay interest due under the notes on January 31, 1980. Thereupon, Beheer again gave notice on February 21, 1980 to Group of acceleration of the amounts due under still outstanding notes and on March 25, 1980 gave similar notice to Samuels and Carbomin as guarantors. Payments of interest and principal due and payable on April 30, 1980 also have not been paid. As already noted, the response of Samuels and his co-plaintiffs to this acceleration was the commencement of this action in May 1980 in the State Supreme Court.

### The Fraud Claim

The essence of plaintiffs' complaint and their reply to Beheer's counterclaim to fore-

---

**2.** While not contained in an affidavit, one of the defendant's briefs states that Samuels is a "sophisticated lawyer/businessman," and was present at and participated in the negotiations. Defendant's Memorandum in Support of Motion, at 16.

close the Samuels mortgage is that the December 1976, the May 1977 "Settlement" and the December 1979 "Modification" agreements were the products of fraud committed by Cohen several years earlier, in 1974, when plaintiffs sold or transferred to Cohen shares of stock in Leckie and Group, representing a minority interest, that were the subject of repurchase by plaintiffs under the December 1976 agreement. The fraud charge is, to say the least, somewhat nebulous. Analysis of plaintiffs' allegations in their complaint, reply and affidavits cannot obscure the fact that they are without evidential support, are contradicted by plaintiffs' acts and conduct over an extended period, and are legally insufficient.

Stripped down to its essentials, plaintiffs allege that as early as 1971, Samuels and Cohen agreed in principle that any acquisition of a coal mine by Samuels would be financed by Cohen, in consideration of which he would receive a share of the acquisition. On that "agreement in principle," which was not written, plaintiffs base their charge of fraud. Thus they allege that after Samuels' acquisition of Leckie in 1973, he was induced in 1974 to sell to Cohen 25% of the outstanding stock of Leckie for a cash payment of $400,000 and upon Cohen's representation "that he could provide financing for all future coal trading and future acquisitions of coal mines"; that thereafter Samuels again was induced to transfer to Cohen 33⅓% of the issued stock of Group upon the same representation and in consideration of Cohen's execution and delivery of $2,000,000 guaranty to American Bank & Trust Company ("ABT"). Plaintiffs charge that not only were Cohen's representations false but fraudulent in that he never had the intention of honoring them or the guaranty to ABT; plaintiffs further allege when such representations were made–that is, in 1974–they "did not know and were unable to ascertain the

truth" and in reliance thereon were induced to deliver to Cohen the Leckie and Group stock.

Plaintiffs, no doubt recognizing the significance of the fact that more than two years had elapsed between the alleged false and fraudulent representations in 1974 and the December 1976 agreement to repurchase the Leckie and Group stock, followed by the successive agreements in which they acknowledge their defaults and their liability with respect to the repurchase, and that on none of those occasions did they assert any claim of fraud as now advanced, seek to meet this situation. They allege that when they entered into those three agreements (December 1976, May 1977 and December 1979), they were not only unaware that Cohen's representations were fraudulent, but also that they "were unable to ascertain the truth at that time." They allege they continued to believe that the representations were true, relied upon them and thereby were induced to enter into the aforementioned agreements.

Despite this explanation, which requires proof that they first learned of essential information after December 7, 1979 to sustain their claim of fraud (assuming that an actionable claim is pleaded), they have not yet submitted a single evidentiary fact to support the charge. From the time they "jumped the gun" by commencing this action in May 1980 to the argument of this motion in the middle of September, they did not submit any matter of factual content to sustain their charge despite the contention, referred to hereafter, that the information became available in April 1980.[3]

█ Under New York law,[4] to plead a prima facie case of fraud, plaintiffs must allege (1) representation of a material existing fact, (2) falsity, (3) scienter, (4) deception and (5) injury.[5] Accordingly, plaintiffs must establish as one of the essential ele-

---

**3.** Samuels Supplemental Affidavit, May 6, 1980, submitted to N.Y.S. Supreme Court in support of temporary restraining order.

**4.** The parties agree that New York law is applicable to all agreements, notes and documents under the terms of their agreements.

**5.** *Reno v. Bull*, 226 N.Y. 546, 550, 124 N.E. 144 (1919); *Ochs v. Woods*, 221 N.Y. 335, 338, 117 N.E. 305 (1917); *Lanzi v. Brooks*, 54 A.D.2d 1057, 388 N.Y.S.2d 946, 947 (3d Dep't 1976).

ments of their claim that Cohen's representations that he "could obtain or provide financing for all future coal trading and future acquisitions of coal mines" were made with a preconceived or undisclosed intention not to perform; that is, that he never intended to honor his statement.[6] That intent represents the state of Cohen's mind and the state of his mind is a fact.[7]

The record is barren of the slightest evidential support for this essential element. Apparently aware of this shortcoming, plaintiffs say that the required information was unavailable because ABT officials were under investigation which was followed by a criminal prosecution. However, this did not prevent them in this civil action, commenced after the termination of the criminal trial and after the time for defendants to appeal had expired,[8] from taking the depositions of any person having knowledge of the facts as authorized under state or federal discovery.

■  Plaintiffs, upon the argument of this motion, belatedly suggested they be afforded an opportunity to take the testimony of witnesses to establish Cohen's lack of intent to live up to his representation. But without making a *"prima facie* showing, through affidavits or other means, to support [their] claim [, their] ... request for discovery on the matter is therefore noth-

ing more than a 'fishing expedition' which would needlessly delay the proceeding."[9] At the time of commencement of this lawsuit, a viable claim must have existed to warrant invoking the discovery process. The discovery rules are not a hunting license to conjure up a claim that does not exist.[10] Plaintiffs have advanced no adequate reason for the Court to defer consideration of defendant's motion. Significantly, with respect to proposed discovery, they have not submitted on this application the name of any witness who purportedly would give support to the claim of Cohen's lack of intention to fulfill his representation as to future financing.[11] The importance of this omission is emphasized by the barrenness of the one that was submitted, that of Stanley Kreitman, a former president of ABT. Kreitman swears that Cohen and Klein, a principal stockholder of ABT, were close business associates; that at the time ABT "considered several million dollars in loand [sic] to certain of the plaintiffs in this action, *it was apparent to me* that Jose Klein knew that ABT was having problems with the New York State Department of Banking and that he *probably conveyed* these facts to Leonard Cohen prior to his execution of a guarantee of the aforesaid loans in the amount of $2 million" (emphasis supplied). If these allegations of alleged

**6.** *Sabo v. Delman*, 3 N.Y.2d 155, 162, 164 N.Y. S.2d 714, 718, 143 N.E.2d 906, 909 (1957); *Adams v. Clark*, 239 N.Y. 403, 146 N.E. 642 (1925); *Adams v. Gillig*, 199 N.Y. 314, 92 N.E. 670 (1910); *Marine Midland Bank v. Meehan's Express Inc.*, 72 A.D.2d 624, 420 N.Y.S.2d 788 (3d Dep't 1979); *see also Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572 (2d Cir. 1969).

**7.** *Deyo v. Hudson*, 225 N.Y. 602, 612, 122 N.E. 635 (1919).

**8.** Samuels Supplemental Affidavit, May 6, 1980, submitted to N.Y.S. Supreme Court, at ' 4.

**9.** *Grand Bahama Petroleum Co. v. Asiatic Petroleum Corp.*, 550 F.2d 1320, 1327 (2d Cir. 1977).

**10.** "Diligent prosecution of a cause of action which is dependent for success upon discovery demands that plaintiffs seek discovery in preparation of his case and not as a back door to a test of the merits of his claim." *Chung Wing*

*Ping v. Kennedy*, 294 F.2d 735, 737 (D.C.Cir. 1961).

**11.** In his supplemental affidavit sworn to on May 6, 1980 and submitted to the state court in support of the application for a temporary restraining order against the defendant, Samuels, after his assertion that evidence was not previously available and that it was not until April 1980 that witnesses have come forward, swore that Saul Kagan, who is the chairman of the executive board and chief executive officer of ABT was "prepared to review available records and be a witness on behalf of the plaintiffs herein in connection with its [sic] case in chief. Other witnesses are similarly first becoming available within recent days." Almost six months have elapsed since that affidavit was filed and the argument of this motion. Neither Kagan's affidavit nor that of any other alleged witness (except Kreitman) has been submitted or have their depositions been taken or any explanation offered for their absence.

proof of a present intention not to adhere to one's representation are typical of what plaintiffs hope to elicit from unnamed witnesses, the discovery would serve no purpose except to delay defendant's right of foreclosure.

While unnecessary for the purpose of disposition of this motion, plaintiffs' assertion, in the light of their repeated contracts, first with Cohen and then with his successor, Beheer, extending over a five–year period, that they were unaware that Cohen's representation was not only false but that he had no intention to perform, taxes credulity beyond belief. The claim is contradicted by Samuels himself. He swears that his purchase of Leckie in 1973 was financed by the National Bank of North America "... due to the fact that Leonard Cohen had breached our agreement and failed to obtain the financing necessary for the acquisition." Thus by his own word he was aware in 1973 that Cohen had failed to perform. Notwithstanding this default, Samuels says that in 1974 he sold 25% of the Leckie shares to Cohen in continued reliance upon his representation of "future financing"; that Cohen introduced him to Jose Klein, the controlling shareholder of ABT, through whom substantial financing was obtained for the Samuels' coal mining interests and in connection with which Cohen executed a guaranty of $2,000,000. Again, upon Samuels' own version, despite Cohen's earlier breach of his agreement, Cohen did provide or cause to be provided the financing, and thus performed. That, as plaintiffs now assert, Cohen did not live up to his guaranty may give rise to a breach of contract claim, but does not support plaintiffs' fraud charge. Indeed, in December 1979, long after the alleged failure to finance the Leckie venture and again after allegedly Cohen failed to live up to his $2,000,000 guaranty, all the plaintiffs confirmed the validity of all existing agreements in the Modification Agreement.

Except as expressly modified hereby, the Settlement Agreement [May 1977], Security Agreements, Guarantees, Notes and all other agreements executed pursuant thereto or in accordance therewith shall continue in full force and effect.[12]

The notes provide:

Group hereby waives the benefit of all laws now or hereafter in effect in any way limiting or restricting its liability under this Note, and any offset, defense or counterclaim of any nature whatsoever, including without limitation (i) any claim or assertion as to the invalidity of, or any other defense whatsoever to, any of the obligations set forth herein, and (ii) all rights to a stay of execution and exemption of property in any action to enforce its liability thereunder.

And at the same time in December 1979 Samuels increased the mortgage to $1.5 million and Beheer withdrew its outstanding acceleration notice.

The lack of any viable claim is apparent from Samuels' affidavit in which he avers "... Leonard Cohen was so closely related to Jose Klein or in a position to know what was occurring with respect to Klein's banking interest by reason of the fact that Leonard Cohen's own office was located in Klein's bank in Geneva, so that it now appears from evidence adduced at or available from criminal prosecutions in connection with ABT that Leonard Cohen was in collusion with Jose Klein ...." This conclusory allegation, typical of others offered by plaintiffs, has been quoted because it demonstrates a transparent attempt to create the appearance of the existence of a fact issue. Plaintiffs' contention that Cohen's relationship to Klein (also deceased) prior to the execution of the guaranty presents a genuine issue as to Cohen's fraudulent intention which forecloses summary judgment is specious. It has long been the rule that, absent other probative evidence, close association between persons does not permit an inference of collusive purpose or conduct.[13] Plaintiffs are required to reveal the factual basis of their

---

**12.** Modification Agreement, ⸿ 9.

**13.** *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75 at 80 No. 79–7791, slip op. at 163 (2d Cir. 1980); *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977).

claim and cannot do this by vague and conjectural allegations contained in "an affidavit grounded on suspicion and bound together with rumor and hearsay." [14] A party seeking to defeat a motion for summary judgment may not rest on unsupported allegations of his pleadings or conclusory allegations with unwarranted inferences but must set forth facts showing that there is a genuine issue for trial, and the rule "is applicable even to a case in which the plaintiff is attempting to unveil a shadowy and elusive conspiracy . . . ." [15]

Entirely apart from plaintiffs' failure to show the existence of a fact issue as to one essential element of their fraud charge, other considerations also require that defendant prevail on this motion. Plaintiffs' allegations do not constitute actionable fraud under New York law. While it is recognized that a misrepresentation of an objective material fact may ground a fraud claim for rescission,[16] statements of opinion are in a different category.[17]

Statements that things are "good," "valuable," "large," or "strong," necessarily involve an exercise of individual judgment, and even though made absolutely the hearer must know this.[18]

Thus the issue turns on whether Cohen's statement that he "could obtain or provide financing for all future coal trading and future acquisitions" for plaintiffs is subjective or objective. It must be stamped as subjective and expressing Cohen's belief or opinion; this is so particularly in view of the many variables entirely beyond his control that necessarily must come into play with respect to future financing—these include, but are not limited to, the financial condition of the borrower, the plaintiffs; their managerial ability to conduct a suc-

cessful operation of the proposed project; their credit standing in the financial community; their capacity to provide security either on their own or through third parties; the condition of the money market, in this instance, on the national and international levels. These matters were not only beyond Cohen's control, but "obviously not capable of objective calibration." [19] His statements of ability to provide unlimited future financing and in unlimited amounts for plaintiffs were, as another court has aptly put it, "projections, [and] however persuasive in shaping plaintiffs' plans, were opinions subject to the uncontrollable economic influences of free enterprise and not fraudulent representations of past or existing facts on which plaintiff justifiably relied to its detriment." [20]

In a case where the alleged representation was much stronger than that attributed to Cohen (the promisor there had represented that he, himself, "would furnish necessary money to carry on the business if the company were reorganized"), the New York State Court of Appeals held:

Although a false representation as to a state of mind may be a false representation of a material fact (*Deyo v. Hudson*, 225 N.Y. [602] 605, 612 [122 N.E. 635]), it does not follow that every broken promise acted upon is actionable. Mere promissory statements as to what will be done in the future are not actionable. (*People v. Miller*, 169 N.Y. 339, 350 [62 N.E. 418.]) It may well be that [the promisor] intended to help the company but with the best of intentions changed his mind when he discovered that its financial condition was hopeless.[21]

Our own Court of Appeals in *Stern v. Satra Corp.* [22] rejected a claim of fraud

---

**14.** *Applegate v. Top Associates*, 425 F.2d 92, 97 (2d Cir. 1970).

**15.** *Id.* at 96.

**16.** *Seneca Wire & Mfg. Co. v. A. B. Leach & Co.*, 247 N.Y. 1, 159 N.E. 700 (1928); *Bloomquist v. Farson*, 222 N.Y. 375, 118 N.E. 855 (1918).

**17.** *See Stern v. Satra Corp.*, 539 F.2d 1305, 1308 (2d Cir. 1976).

**18.** Restatement of Contracts § 474, comment (c) (1932); *see* 12 S. Williston, Contracts § 1491 (3d ed. 1970).

**19.** *Stern v. Satra Corp.*, 539 F.2d 1305, 1308–09 (2d Cir. 1976).

**20.** *Kelly Tire Service, Inc. v. Kelly–Springfield Co.*, 338 F.2d 248, 253 (8th Cir. 1964)

**21.** *Adams v. Clark*, 239 N.Y. 403, 410, 146 N.E. 642 (1925).

**22.** 539 F.2d 1305, 1309 (2d Cir. 1976).

where a consultant had represented to his employer his ability to influence a large corporation, International Business Machines, to become a client and that his retention was thus necessary for the employer to acquire IBM as a customer. What was said there is particularly pertinent here. "Stern [the consultant] could not be positive about the extent of his influence and Satra [the promisee] should have realized this. Certainly Satra was not a naive or unsophisticated participant in the field of international trade and commerce apt to be beguiled or gulled by Stern's asserted contact." The Court held that the representation by the consultant of his ability to influence IBM merely constituted "an opinion or subjective appraisal." The broad sweep of Cohen's representation with its unlimited duration and unlimited amount would, under New York law, be held an expression of opinion rather than of fact and could not constitute actionable misrepresentation.[23]

Plaintiffs have also pleaded an assortment of defenses to defendant's foreclosure suit, to wit, duress, failure of consideration, defendant's alleged agreement in December 1979 not to foreclose, waiver of defaults and forbearance. These defenses are so contradicted by the very agreements that plaintiffs signed, by their own actions and conduct and the lack of the slightest factual support for any statement, as not to merit discussion.

■ In sum, a careful study of this record compels the conclusion, to state it bluntly, that this action, commenced by plaintiffs when defendant notified them of its purpose to foreclose on the mortgage, was simply a stalling operation to delay the judgment day and their defenses are of a similar thrust. Rule 56 was not intended for any such purpose. This Court is not unmindful that our Court of Appeals has rigidly and at times, "with some timidity,"[24] applied Rule 56 to make certain that a litigant is not

deprived of his right to a jury trial, but it has also admonished that "just as a trial by affidavit represents an unjustified diminution of the rights of plaintiffs, neither courts nor defendants should be subjected to trials which can be little more than harassment."[25] The defendant is entitled to a decree of foreclosure without being forced to a trial on unsupported and conclusory allegations of fraud, duress, lack of consideration, forbearance and so forth.

The defendant's motion for summary judgment is granted.

So ordered.

**23.** *See also Lanzi v. Brooks,* 54 A.D.2d 1057, 388 N.Y.S.2d 946 (3d Dep't 1976); *Irving Trust Company v. LaPilar Realty Inc.,* 56 A.D.2d 532, 391 N.Y.S.2d 131 (1st Dep't 1977) (allegation that Bank, which sought to foreclose on its mortgage fraudulently, induced defendant to execute the mortgage with knowledge that it

was dangerously underfinanced, not actionable in fraud because based on mere opinion).

**24.** *Applegate v. Top Associates,* 425 F.2d 92, 96 (2d Cir. 1970).

