629 F.2d 764
 Donald E. LEWIS, Plaintiff-Appellant,
v.
S. L. & E., INC., Alan E. Lewis, Leon E. Lewis, Jr., and
Richard E. Lewis, Defendants-Appellees.
LEWIS GENERAL TIRES, INC., Plaintiff-Intervenor-Appellee,
v.
Donald E. LEWIS, Defendant-Appellant.
 No. 893, Docket 79-7767.
 United States Court of Appeals,
Second Circuit.
 Argued March 20, 1979.
Decided July 22, 1980.
 
 James L. Hamilton, Cleveland, Ohio (Law Offices of Epp & Hamilton, Cleveland, Ohio, on the brief), for appellant Donald E. Lewis.
 Charles B. Kenning, Rochester, N. Y. (Kaufman, Kenning, Tyle & D'Amanda, Rochester, N. Y., on the brief), for appellees S. L. & E., Inc., Richard E. Lewis, and Lewis General Tires, Inc.
 Before TIMBERS and KEARSE, Circuit Judges, and LASKER, District Judge.*
 KEARSE, Circuit Judge:
 
 
 1
 This case arises out of an intra-family dispute over the management of two closely-held affiliated corporations. Plaintiff Donald E. Lewis ("Donald"), a shareholder of S.L. & E., Inc. ("SLE"), appeals from judgments entered against him in the United States District Court for the Western District of New York, Harold P. Burke, Judge, after a bench trial of his derivative claim against directors of SLE, and of a claim asserted against him by the other corporation, Lewis General Tires, Inc. ("LGT"), which intervened in the suit. The defendants Alan E. Lewis ("Alan"), Leon E. Lewis, Jr. ("Leon, Jr."), and Richard E. Lewis ("Richard"), are the brothers of Donald; they were, at pertinent times herein, directors of SLE and officers, directors and shareholders of LGT. Donald charged that his brothers had wasted the assets of SLE by causing SLE to lease business premises to LGT from 1966 to 1972 at an unreasonably low rental. LGT was permitted to intervene in the action, and filed a complaint seeking specific performance of an agreement by Donald to sell his SLE stock to LGT in 1972. The district court held that Donald had failed to prove waste by the defendant directors, and entered judgment in their favor. The court also awarded attorneys' fees to the defendant directors and to SLE, and granted LGT specific performance of Donald's agreement to sell his SLE stock.
 
 
 2
 On appeal, Donald argues that the district court improperly allocated to him the burden of proving his claims of waste, and that since defendants failed to prove that the transactions in question were fair and reasonable, he was entitled to judgment. Donald also argues that the awards of attorneys' fees were improper. We agree with each of these contentions, and therefore reverse and remand.
 
 
 3
 * For many years Leon Lewis, Sr., the father of Donald and the defendant directors, was the principal shareholder of SLE and LGT. LGT, formed in 1933, operated a tire dealership in Rochester, New York. SLE, formed in 1943, owned the land and complex of buildings at 260 East Avenue in Rochester. This property was SLE's only significant asset. Prior to 1956 LGT occupied SLE's premises without benefit of a lease; the rent paid was initially $200 per month, and had increased over the years to $800 per month by 1956, when additional parcels were added. On February 28, 1956, SLE granted LGT a 10-year lease on the newly expanded property ("the Property"), for a rent of $1200 per month, or $14,400 per year. Under the terms of the lease, SLE was responsible for payment of real estate taxes on the Property, while all other current expenses were to be borne by the tenant, LGT.[1]
 
 
 4
 In 1962, Leon Lewis, Sr., transferred his SLE stock, 90 shares in all, to his six children (defendants Richard, Alan and Leon, Jr., plaintiff Donald, and two daughters, Margaret and Carol), giving 15 shares to each.[2] At that time Richard, Alan and Leon, Jr., were already shareholders, officers and directors of LGT. Contemporaneously with their receipt of SLE stock, all six of the children entered into a "shareholders' agreement" with LGT, under which each child who was not a shareholder of LGT on June 1, 1972 would be required to sell his or her SLE shares to LGT, within 30 days of that date, at a price equal to the book value of the SLE stock as of June 1, 1972.[3]
 
 
 5
 LGT's lease on the SLE property expired on February 28, 1966. At that time the directors of SLE were Richard, Alan, Leon, Jr., Leon, Sr., and Henry Etsberger; these five were also the directors of LGT. In 1966 Alan owned 44% of LGT, Richard owned 30%, Leon, Jr., owned 19%, and Leon, Sr., owned 7%. From 1967 to 1972 Richard owned 61% of LGT and Leon, Jr., owned the remaining 39%. When the lease expired in 1966, no new lease was entered into. LGT nonetheless continued to occupy the property and to pay SLE at the old rate, $14,400 per year. According to the defendants' testimony at trial, there was never any thought or discussion among the SLE directors of entering into a new lease or of increasing the rent. Richard testified: "We never gave consideration to a new lease." From all that appears, the defendant directors viewed SLE as existing purely for the benefit of LGT. Richard testified, for example, that although real estate taxes rose sharply during the period 1966-1971, from approximately $7,800 to more than $11,000, to be paid by SLE out of its constant $14,400 rental income, raising the rent was never mentioned. He testified that SLE was "only a shell to protect the operating company (LGT)." When this suit was commenced there had not been a formal meeting of either the shareholders or the directors of SLE since 1962. Richard, Alan and Leon, Jr., had largely ignored SLE's separate corporate existence[4] and disregarded the fact that SLE had shareholders who were not shareholders of LGT and who therefore could not profit from actions that used SLE solely for the benefit of LGT.
 
 
 6
 Neither Donald nor his sisters ever owned LGT stock. As the June 1972 date approached for the required sale of their SLE stock to LGT, Donald apparently came to believe that SLE's book value was lower than it should have been. He sought SLE financial information from Richard, who had been president of SLE since 1967.[5] Richard refused to provide information. Donald therefore refused to sell his SLE shares in 1972,[6] and commenced this shareholders' derivative action in the district court in August 1973, basing jurisdiction on diversity of citizenship.[7] The sole claim raised in the complaint was that the defendant directors[8] had wasted the assets of SLE by "grossly undercharging" LGT for the latter's occupancy and use of the Property. Although the complaint charged such mismanagement for the period 1962 to 1973, plaintiff subsequently limited this claim to the period between February 28, 1966, the date on which the lease expired,[9] and June 1, 1972, the date contractually set for valuation of the SLE shares which plaintiff had agreed to sell to LGT. LGT intervened and demanded specific performance of Donald's agreement to sell his SLE stock. Donald did not contest his ultimate obligation to sell, but took the position that since the book value of the shares would be increased if he prevailed on his derivative claim, specific performance should be granted only after adjudication of that claim.
 
 
 7
 There ensued an eight-day bench trial, at which plaintiff sought to prove, by the testimony of several expert witnesses, that the fair rental value of the Property was greater than the $14,400 per year that SLE had been paid by LGT. Defendants sought to show that the rental paid was reasonable, by offering evidence concerning the financial straits of LGT, the cost to LGT of operating the Property, the general economic decline of the East Avenue neighborhood, and rentals paid on two other properties in that neighborhood. LGT presented expert testimony that the value of plaintiff's stock as of June 1972, assuming a successful defense of the derivative claims, was $15,650.
 
 
 8
 The district court subsequently filed lengthy and detailed findings of fact and conclusions of law. Many of the court's findings went to the validity and probative value of the testimony given by plaintiff's expert witnesses, and the court ultimately declined to credit that testimony. On this basis, the court held that Donald had failed to establish the rental value of the Property during the period at issue, and that defendants were therefore entitled to judgment on the derivative claims. Implicit in the district court's ruling, granting judgment for defendants upon plaintiff's failure to prove waste, was a determination that plaintiff bore the burden of proof on that issue. The court also ruled that LGT was entitled to specific performance of Donald's agreement to sell his SLE stock, and that Donald was not entitled to recover attorneys' fees from SLE, but that SLE and the individual defendants were entitled to attorneys' fees from Donald.[10] This appeal followed.
 
 II
 
 9
 Turning first to the question of burden of proof, we conclude that the district court erred in placing upon plaintiff the burden of proving waste. Because the directors of SLE were also officers, directors and/or shareholders of LGT, the burden was on the defendant directors to demonstrate that the transactions between SLE and LGT were fair and reasonable. New York Business Corporation Law ("BCL") § 713(b) (McKinney Supp.1979) (eff. September 1, 1971); BCL § 713(a)(3) (McKinney 1963) (repealed as of September 1, 1971); see Cohen v. Ayers, 596 F.2d 733, 739-40 (7th Cir. 1979) (construing current BCL § 713); Remillard Brick Co. v. Remillard-Dandini Co., 109 Cal.App.2d 405, 241 P.2d 66, 75 (1952) (construing California Corporations Code § 820, upon which the prior BCL § 713 was patterned).
 
 
 10
 Under normal circumstances the directors of a corporation may determine, in the exercise of their business judgment, what contracts the corporation will enter into and what consideration is adequate, without review of the merits of their decisions by the courts. The business judgment rule places a heavy burden on shareholders who would attack corporate transactions. Galef v. Alexander, 615 F.2d 51, 57-58 (2d Cir. 1980); Auerbach v. Bennett, 47 N.Y.2d 619, 629, 419 N.Y.S.2d 920, 926, 393 N.E.2d 994, 1000 (1979); 3A Fletcher, Cyclopedia of the Law of Private Corporations § 1039 (perm. ed. 1975). But the business judgment rule presupposes that the directors have no conflict of interest. When a shareholder attacks a transaction in which the directors have an interest other than as directors of the corporation, the directors may not escape review of the merits of the transaction. At common law such a transaction was voidable unless shown by its proponent to be fair, and reasonable to the corporation.[11] BCL § 713, in both its current and its prior versions, carries forward this common law principle, and provides special rules for scrutiny of a transaction between the corporation and an entity in which its directors are directors or officers or have a substantial financial interest.
 
 
 11
 The current version of § 713,[12] which became effective on September 1, 1971, and governs at least so much of the dealing between SLE and LGT as occurred after that date, expressly provides that a contract between a corporation and an entity in which its directors are interested may be set aside unless the proponent of the contract "shall establish affirmatively that the contract or transaction was fair and reasonable as to the corporation at the time it was approved by the board . . . ." § 713(b). Thus when the transaction is challenged in a derivative action against the interested directors, they have the burden of proving that the transaction was fair and reasonable to the corporation. Cohen v. Ayers, supra.
 
 
 12
 The same was true under the predecessor to § 713(b), former § 713(a)(3), which was in effect prior to September 1, 1971.[13] Section 713(a)(3) was not explicit as to the burden of proof, but simply stated that a transaction with interested directors would not be voidable "If the contract or transaction is fair and reasonable as to the corporation at the time it is approved by the board . . . ." The consensus among the commentators was that § 713(a)(3) carried forward the common law rule, which placed the burden of proof as to fairness on the interested directors. E. g., Hoffman, The Status of Shareholders and Directors Under New York's Business Corporation Law: A Comparative View, 11 Buff.L.Rev. 496, 566 (1962); Note, "Interested Director's" Contracts Section 713 of the New York Business Corporation Law and the "Fairness" Test, 41 Fordham L.Rev. 639, 648-49 (1973); see also Note, The Status of the Fairness Test Under Section 713 of the New York Business Corporation Law, 76 Colum.L.Rev. 1156, 1167-74 (1976) (discussing legislative history). We agree with this construction. Cf. Remillard Brick Co. v. Remillard-Dandini Co., supra (burden of proof allocated to interested directors under California Corporations Code § 820, upon which § 713(a)(3) was modeled).
 
 
 13
 During the entire period 1966-1972, Richard, Alan and Leon, Jr., were directors of both SLE and LGT;[14] there were no SLE directors who were not also directors of LGT. Richard, Alan and Leon, Jr., were all shareholders of LGT in 1966, and from 1967 to 1972 Richard and Leon, Jr., were the sole shareholders of LGT. Under BCL § 713, therefore, Richard, Alan and Leon, Jr., had the burden of proving that $14,400 was a fair and reasonable annual rent for the SLE property for the period February 28, 1966 through June 1, 1972.
 
 
 14
 Our review of the record convinces us that defendants failed to carry their burden. At trial, there was no direct testimony as to what would have been a fair rental during the relevant period, i. e., 1966 to 1972, and the evidence that was introduced fell far short of establishing that $14,400 was a fair annual rental value for those years.
 
 
 15
 Quite clearly Richard, Alan and Leon, Jr., had made no effort to determine contemporaneously what rental would be fair during the years 1966-1972. Their view was that the rent should simply cover expenses and that SLE existed for the benefit of LGT.[15] During this period no appraisals were made; no attempts were made to sell or rent the Property; no thought whatever was given to whether $14,400 was a fair and reasonable rent even when real estate taxes had risen to consume nearly all of that amount.
 
 
 16
 Defendants offered instead evidence of rents paid on other properties. Among their best evidence was the expert testimony of Harvey Rosenbloom, a real estate appraiser. Rosenbloom testified that two other East Avenue buildings, which the district court found to be comparable to the 260 East Avenue premises, were leased at lower per-square-foot rentals than was paid by LGT to SLE. However, as to one of these properties, Rosenbloom testified only to rent paid in 1973 and 1974, and did not consider the 1966-1972 period. As to the other property, Rosenbloom described a fifteen year lease that was entered into in 1961. This testimony, while perhaps not wholly irrelevant to the issues in this suit, fell far short of demonstrating what rental the Property could have fetched in 1966, or in any other of the relevant years. Indeed, Rosenbloom himself testified that rental value could well be different for each year of the period. Thus, rentals that Rosenbloom testified were agreed to in 1961 or 1973 might well have been unfair in 1966 or 1967. This evidence thus could not support a finding that defendants acted fairly in maintaining an annual rental of $14,400 during the years from 1966 to 1972.[16]
 
 
 17
 Defendants also produced considerable evidence that over the relevant period, the East End neighborhood had been on an economic decline; that businesses had been leaving the area; that urban renewal projects and increased crime had depressed property values there; and that the area had, in general, become a less desirable place to do business. There was also evidence of specific developments that had an adverse effect on the Property: for example, the street running along one side of the Property was made a one-way street, thus limiting customers' access to LGT's premises. The district court credited all of this testimony, and it is fair to say that defendants proved that there was a general downward trend in the value of the Property. However, as noted above, defendants did not establish what was a fair rental value for the Property in 1966. Absent such a point of reference, a general downward trend in value is of no assistance in determining whether the rental actually paid was fair and reasonable during the ensuing years.
 
 
 18
 Moreover, working in reverse, some of defendants' own evidence as to the value of the Property at the end of the relevant period suggested that $14,400 was less than a fair rental in 1966, and that the figure of $38,099, estimated by plaintiff's expert, was perhaps not far off the mark.[17] First, there was a variety of evidence suggesting that in 1972 the Property was worth more than $200,000. An appraisal by defense witness Harold Grunert in 1972 set the fair market value of the Property as of June 30, 1972, at $220,000. In 1972 Leon, Jr., had offered personally to buy the Property for $200,000, an offer which Richard had rejected.[18] And in 1971, Richard had informed Donald that evaluations by another appraiser, Harold Galloway, had set the value of the Property at $200,000 and $236,000. Second, defendants' expert witness Rosenbloom, asked what he would consider a fair rent for the property, given Grunert's 1972 valuation of $220,000, stated that ten percent of the value would be inadequate and that fifteen to seventeen percent would be closer to adequate. Fifteen percent of $220,000 would have yielded a rent of $33,000 on the basis of the 1972 valuation. Grunert's own expert testimony was entirely consistent with this. While he had made no estimate as to the fair rental value of the property for 1966-1972, he opined that a fair rental as of June 30, 1972, would be $20-21,000 with the tenant paying all expenses including real estate taxes. According to Richard, SLE's real estate taxes in 1972 were about $12,000. Thus Grunert's testimony, too, suggests about $33,000 as the fair rental value in 1972. Finally, consistent with their view of the general downward economic trend, Richard and Alan conceded that, whatever the Property was worth in 1972, it was worth more in 1966.[19] Thus the evidence presented by defendants, far from carrying their burden of showing that $14,400 was a fair and reasonable annual rental in 1966-1972, suggested that the fair rental value of the Property throughout that period exceeded $33,000 per year.
 
 
 19
 The defendants argued, however, that LGT could not have afforded to pay SLE rent higher than $14,400. They produced evidence designed to show that LGT had made little profit; that this low profitability was due to the expenses of maintenance and upkeep of the 260 East Avenue property; and that LGT therefore would not have been able to pay a higher rent to SLE. The district court credited this evidence, finding that LGT had "experienced a number of years of very severe losses," that during the period from 1962-1973, LGT's overall profit was only $53,876, and that payment of rent at the rate of $39,099 per year during this period could have led to the "demise" of LGT. These findings have only a distorted relationship to this lawsuit.
 
 
 20
 The period in issue here is 1966-1972. The only "severe" losses shown, totaling nearly $83,000, occurred in 1963 and 1973. Their inclusion in the computation of what LGT could afford to pay in 1966-1972 was patently unfair. In fact LGT's only unprofitable year during the period in issue was 1969 when its loss was small: $1,168. LGT's after-tax profits in 1966-1972 in fact totaled $102,963, or an average of $14,709 per year. Thus, even on paper, LGT could have "afforded" to double its rent payments to SLE during the period in question.
 
 
 21
 Moreover, the proposition that LGT could not afford to pay as rent more than what its own books showed as profits ignores the fact that LGT was owned and managed by members of the Lewis family, some of whom were also employees of that corporation. It is entirely possible that these family members granted to themselves unusually high salaries or other perquisites, thus reducing LGT's paper profits. For example, in 1966 Richard's salary was approximately $21,000; Leon, Jr.'s compensation was $3,000 salary plus commissions. In 1967, LGT acquired all of Alan's LGT stock; and Richard and Leon, Jr., acquired all of the LGT stock of their father, agreeing to pay the purchase price over a ten-year period. Richard and Leon, Jr., thus became LGT's only shareholders, and their LGT salaries were immediately increased by a total of $23,000 per year (Richard's salary went from $21,000 to $36,000; Leon, Jr.'s went from $3,000 to $11,000), to cover the cost of the LGT stock they had just acquired.[20] Defendants bore the burden of proof on the question of a fair and reasonable rental; if they would rely on the proposition that LGT was unable to pay more, it was incumbent on them to demonstrate the fairness of the management and the reasonableness of the conduct of LGT's affairs. It does not appear that they made any effort to do so.
 
 
 22
 Finally, even if we were to assume that LGT's financial records provided a fair basis for evaluating the SLE-LGT transactions, defendants would not have carried their burden of proof. Defendants did not demonstrate that SLE could not have found some other tenant, stronger financially than LGT, which would have been willing and able to pay a higher rental. Even given the general downward trend of the East Avenue neighborhood, it is entirely possible that at least during the early years of the 1966-1972 period, such a tenant might have been secured. No effort was made during that period to rent to anyone other than LGT.
 
 
 23
 We conclude, therefore, that defendants failed to prove that the rental paid by LGT to SLE for the years 1966-1972 was fair and reasonable. Thus, Donald is not required to sell his SLE shares to LGT without such upward adjustment in the June 1, 1972, book value of SLE as may be necessary to reflect the amount by which the fair rental value of the Property exceeded $14,400 in any of the years 1966-1972.
 
 III
 
 24
 The district court also erred in entering awards of attorneys' fees in favor of the defendant directors and SLE. Under New York law,[21] such awards are improper absent statutory authorization. City of Buffalo v. J. W. Clement Co., 28 N.Y.2d 241, 262-63, 321 N.Y.S.2d 345, 364, 269 N.E.2d 895, 908 (1971). Defendants have not pointed to any statute that would allow an award of attorneys' fees to them in this case, and our research has disclosed none.[22] Insofar as the district court may have premised these awards on an implicit finding that plaintiff brought this action in bad faith, our reversal on the merits removes the basis for such a determination. Accordingly, we reverse the awards of attorneys' fees to the defendants and SLE.
 
 
 25
 Finally, we note that plaintiff sought unsuccessfully in the district court to recover his own attorneys' fees from the defendants. New York law permits the award of attorneys' fees to the attorney for a successful derivative plaintiff, out of the corporation's recovery from the defendants. BCL § 626(e); Ripley v. International Railways, 16 App.Div.2d 260, 227 N.Y.S.2d 64 (1st Dep't), aff'd, 12 N.Y.2d 814, 236 N.Y.S.2d 64, 187 N.E.2d 131 (1962); Jones v. Uris Sales Corp., 373 F.2d 644 (2d Cir. 1967). We suggest that, in light of our decision, a new motion in the district court for such an award would not be inappropriate.
 
 
 26
 We remand to the district court (a) for the entry of judgment in favor of SLE against Richard, Alan and Leon, Jr., jointly and severally, in such amount as the district court shall determine to be equal to the amounts by which the annual fair rental value of the Property exceeded $14,400 in the period February 28, 1966-June 1, 1972, (b) for an accounting as to the value of Donald's SLE shares as of June 1, 1972, in light of such judgment, (c) for an order, following such accounting, of specific performance of the shareholders' agreement, and (d) for such other proceedings as are not inconsistent with this opinion.
 
 
 
 *
 Honorable Morris E. Lasker, Judge of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 It appears that SLE was also responsible for payments due on a mortgage on the Property. In addition, LGT charged SLE for the costs of certain capital improvements, such as the major structural repairs to the principal building's facade, carried out in 1969
 
 
 [2]
 SLE had 150 shares outstanding, and each child thus received a ten percent interest. At the same time LGT purchased the remaining 60 outstanding shares from the elder Lewis's business partner, Henry Etsberger
 
 
 [3]
 The agreement specified procedures by which the book value, and hence the price of the shares, would be determined
 
 
 [4]
 For example, Richard's testimony includes the following statements:
 Q Mr. Lewis, you have always looked at these two corporations as being one and the same, haven't you, Lewis General Tires and S.L. & E.?
 A Yes.
 I never really got into S.L. & E. at all. (Tr. 6/21/78, at 972-73.)
 I don't think I ever looked at an operating statement of S.L. & E. seriously. (Id. at 991.)
 I had very little to do with S.L. & E. (Tr. 7/28/78, at 80.)
 Alan testified that at no time after 1964 did he participate in any discussions of any increase in rent for SLE. (Id. at 160, 164.)
 And Leon, Jr., testified, "I didn't have anything to do with running S.L. & E. . . . ." (Id. at 230.)
 
 
 [5]
 It does not appear that SLE paid salaries to any of its officers or directors
 
 
 [6]
 Donald's sisters Carol and Margaret sold their SLE shares to LGT in 1972 and 1973 respectively. Alan, who had sold his LGT stock in 1967, sold his SLE stock to LGT in 1972
 
 
 [7]
 When suit was commenced, plaintiff was a citizen of Ohio, Alan was a citizen of Florida and all of the other individual defendants were citizens of New York. SLE is a New York corporation and has its principal place of business in New York
 
 
 [8]
 Leon E. Lewis, Sr., also was originally named as a defendant in this action. When he died in 1975 his executor was substituted as a defendant; subsequently the parties stipulated to dismissal of the executor. Etsberger died in about 1969, and his estate was not named as a defendant
 
 
 [9]
 Donald was not a shareholder of SLE in 1956 when the lease was entered into and hence had no standing to challenge its terms. BCL § 626(b); Bernstein v. Polo Fashions, Inc., 55 A.D.2d 530, 389 N.Y.S.2d 368 (1st Dep't 1976)
 
 
 [10]
 The district court also held that plaintiff was not a proper party to bring this action, and that the claim of waste was not properly asserted derivatively. Both of these conclusions were incorrect
 As to the first point, plaintiff asserts that he has been, at all relevant times, a shareholder of SLE. As such, he would be a proper party to assert claims on behalf of the corporation in a derivative action, regardless of the number of shares he owns, and whether or not any other shareholder wishes that the claims be pursued. N.Y.Bus.Corp.Law § 626(a) (McKinney 1963); Greenberg v. Acme Folding Box Co., 84 Misc.2d 181, 374 N.Y.S.2d 997 (Sup.Ct.1975). In this Court, defendants argue that Donald no longer owns SLE shares in his own right, having transferred his shares in 1971 to himself as custodian for his three children, pursuant to the Ohio Uniform Gifts to Minors Act. Defendants did not raise this point below; indeed, defendants admitted Donald's stock ownership in their answer, and defendants' counsel repeated the concession at trial. They may not raise the issue now.
 On the second point, it is clear that plaintiff's claim of corporate waste is properly asserted by way of a derivative action. N.Y.Bus.Corp.Law § 626(a); Bernstein v. Polo Fashions, Inc., supra. Indeed, such a claim of waste must be brought derivatively, and cannot be asserted in a direct action. Empleton v. D'Elia Gemstones Corp., 46 A.D.2d 751, 360 N.Y.S.2d 683 (1st Dep't 1974).
 
 
 [11]
 E. g., Geddes v. Anaconda Copper Co., 254 U.S. 590, 599 (1921); Sage v. Culver, 147 N.Y. 241, 41 N.E. 513 (1895); Kaminsky v. Kahn, 23 App.Div.2d 231, 240, 259 N.Y.S.2d 716, 725 (1st Dep't 1965); Tomarkin v. Vitron Research Corp., 12 App.Div.2d 496, 206 N.Y.S.2d 869 (2d Dep't 1960). See also 3 Fletcher, supra § 921
 
 
 [12]
 BCL § 713 (McKinney Supp.1979) provides in pertinent part:
 (a) No contract or other transaction between a corporation and one or more of its directors, or between a corporation and any other corporation, firm, association or other entity in which one or more of its directors are directors or officers, or have a substantial financial interest, shall be either void or voidable for this reason alone or by reason alone that such director or directors are present at the meeting of the board, or of a committee thereof, which approves such contract or transaction, or that his or their votes are counted for such purpose:
 (1) If the material facts as to such director's interest in such contract or transaction and as to any such common directorship, officership or financial interest are disclosed in good faith or known to the board or committee, and the board or committee approves such contract or transaction by a vote sufficient for such purpose without counting the vote of such interested director or, if the votes of the disinterested directors are insufficient to constitute an act of the board as defined in section 708 (Action by the board), by unanimous vote of the disinterested directors; or
 (2) If the material facts as to such director's interest in such contract or transaction and as to any such common directorship, officership or financial interest are disclosed in good faith or known to the shareholders entitled to vote thereon, and such contract or transaction is approved by vote of such shareholders.
 (b) If such good faith disclosure of the material facts as to the director's interest in the contract or transaction and as to any such common directorship, officership or financial interest is made to the directors or shareholders, or known to the board or committee or shareholders approving such contract or transaction, as provided in paragraph (a), the contract or transaction may not be avoided by the corporation for the reasons set forth in paragraph (a). If there was no such disclosure or knowledge, or if the vote of such interested director was necessary for the approval of such contract or transaction at a meeting of the board or committee at which it was approved, the corporation may avoid the contract or transaction unless the party or parties thereto shall establish affirmatively that the contract or transaction was fair and reasonable as to the corporation at the time it was approved by the board, a committee or the shareholders.
 
 
 [13]
 BCL § 713 (McKinney 1963) (repealed) provided in pertinent part:
 (a) No contract or other transaction between a corporation and one or more of its directors, or between a corporation and any other corporation, firm, association or other entity in which one or more of its directors are directors or officers, or are financially interested, shall be either void or voidable for this reason alone or by reason alone that such director or directors are present at the meeting of the board, or of a committee thereof, which approves such contract or transaction, or that his or their votes are counted for such purpose:
 (1) If the fact of such common directorship, officership or financial interest is disclosed or known to the board or committee, and the board or committee approves such contract or transaction by a vote sufficient for such purpose without counting the vote or votes of such interested director or directors;
 (2) If such common directorship, officership or financial interest is disclosed or known to the shareholders entitled to vote thereon, and such contract or transaction is approved by vote of the shareholders; or
 (3) If the contract or transaction is fair and reasonable as to the corporation at the time it is approved by the board, a committee or the shareholders.
 
 
 [14]
 Alan ceased to be a director in November 1972; Leon, Jr., ceased to be a director in 1977. Richard remains a director
 
 
 [15]
 See footnote 4 supra, and accompanying text
 
 
 [16]
 Defendant Richard E. Lewis testified that defendants tried, without success, to sell the Property in 1975, listing it with a realtor for $200,000. In addition he testified that an effort was made to rent the Property in 1973, and that only one offer, for $700 per month, was forthcoming. Since these efforts were made in 1973 and 1975, this evidence, like the evidence as to rentals of other property, was too remote in time to establish a fair rental value, especially as to the earlier years of the 1966-1972 period
 
 
 [17]
 Plaintiff's expert made his evaluation as of February 1973. He did not make any evaluation for the period 1966-1972
 
 
 [18]
 Leon, Jr., had just been fired from LGT by Richard
 
 
 [19]
 Leon, Jr., did not know whether the value had decreased from 1966 to 1972, but did not believe it had risen
 
 
 [20]
 Richard had no doubt he could have paid for his newly acquired shares without the increase in his LGT salary. Leon, Jr., apparently lacked other resources from which to pay for the LGT stock (at least after he was fired from LGT in 1972)
 
 
 [21]
 In this diversity action, state law governs the question of availability of attorneys fees'. Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 259 n.31, 95 S.Ct. 1612, 1622-1623, 44 L.Ed.2d 141 (1975); 6 Moore's Federal Practice P 54.77(2) at 1712-13 (2d ed. 1976)
 
 
 [22]
 N.Y.Bus.Corp.Law § 627 (McKinney Supp.1979), under which a shareholder bringing a derivative action may be required to give security for costs and attorneys' fees, does not apply to this case because plaintiff owns more than 5% of the shares of SLE. In those derivative actions where § 627 does not apply, there is no statutory basis for awarding attorneys' fees against a plaintiff shareholder. See Schielcrawt v. Moffett, 294 N.Y. 180, 187, 61 N.E.2d 435, 438 (1945) and Isensee v. Long Island Motion Picture Co., 184 Misc. 625, 54 N.Y.S.2d 566 (Sup.Ct.1945) (construing the predecessor section to § 627, General Corporation Law § 61-b)