**PROMOVOYAGE, S.A.R.L., Plaintiff,**

v.

**Sergio R. BOSCO, d/b/a Empire Vacations, a/k/a Your Airline Connection, a/k/a Medi Travel, a/k/a Avio Liguri Airlines; Francis Crispo, a/k/a Francis Crispo De Nixia, a/k/a Francis Crispo De Monteleone, a/k/a Francis Crispo De Nixia De Albia De Monteleone, d/b/a Empire Vacations, a/k/a Your Airline Connection, a/k/a Medi Travel, a/k/a Avio Liguri Airlines; Avio Liguri Airlines, Inc., Romanda Tours, Inc.; Romanda Senior Tours, Inc.; Josephine Bosco, Lia Bosco and Jamie Wolfe, Defendants.**

**No. 81 Civ. 6122.**

United States District Court, S.D. New York.

March 4, 1983.

was under contract with one of its customers, the French National Gas Company ("Gaz de France"), to book passage for 125 of the customer's employees to travel from France to the United States, where they were to attend a convention on solar energy. Patrick Cartier is the principal officer of Promovoyage.

The defendant, Your Airline Connection ("Your Airline"), is a New York corporation and is engaged in the business of organizing and marketing wholesale group travel package tours. The defendants, Sergio Bosco ("Bosco") and Francis Crispo ("Crispo"),[1] are the sole shareholders and are officers of Your Airline. Also named as defendants are other officers, Lia Bosco and Josephine Bosco, respectively secretary and treasurer. In addition, plaintiff has named Romanda Senior Tours,[2] a New York corporation, also known as Medi Tours and Medi Travel ("Medi"), and Jamie Wolfe,[3] counsel to Your Airline.

Commencing in June, and continuing through July 1980,[4] Cartier, in Paris, through telex communications with Bosco in New York and in several personal conferences in New York, negotiated and agreed upon the terms for the Gaz de France trip to the United States. Your Airline was to submit to Promovoyage in Paris both a formal contract embodying the terms of their agreement and an invoice for the amount of the tour, which were required under French exchange control regulations in order to transfer funds out of France. With the date of departure approaching and Cartier not having received the agreed upon formal contract, he returned to New York City on October 6, where he met with Bosco and Crispo, and a written agreement was executed which provided that upon payment by Promovoyage of $100,062.50 Your Airline would provide air and land

Hill, Betts & Nash, New York City, for plaintiff; Christopher Kende, New York City, of counsel.

Nicholas P. Scelsa, Patchogue, N.Y., for defendants.

## OPINION FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

The plaintiff, Promovoyage, S.A.R.L. ("Promovoyage"), is a French corporation engaged in booking airplane and hotel reservations for large groups. Promovoyage

1. Upon Crispo's failure to comply with discovery rules and orders of this Court, a default judgment was ordered against him, the damages to be fixed on this trial.

2. Pursuant to an order of the Bankruptcy Court, this action against Romanda Senior Tours has been stayed.

3. Wolfe failed to answer the complaint and a default was entered.

4. All dates are in the year 1980.

arrangements for the Gaz de France group. The arrangements included round trip air transportation between Paris, France, and Orlando, Florida, on TWA flight 803, leaving Paris November 4 and returning November 11; hotel accommodations with meals in Orlando and Miami; private motor coach transportation between airports and hotels; specified excursions; various tourist attractions in Orlando; conference room facilities at hotels and a professional English/French speaking tour escort for the group.

After the written contract had been executed, Cartier, based upon some incidents during the course of negotiations with Bosco and Crispo, and also upon information derived from other sources, was apprehensive that they and Your Airline would faithfully carry out the terms of the agreement. Concerned with Promovoyage's own reputation in the group air travel field, and also because Gaz de France was a good customer, Cartier again came to New York with two French bank checks drawn on Bankers Trust Company payable to Your Airline in the amounts of $50,462.50 and $49,600. Cartier met with Bosco on October 20 and tendered the two checks for the tickets on the TWA flight pursuant to the October 6 agreement, but Bosco failed to deliver the required tickets. Thereupon, Cartier retained a New York attorney, Mark Skolnick. They met the next day, October 21, with Bosco, Crispo and Norman Harlow, an attorney who represented Your Airline. The parties executed a second agreement dated that day, which provided that the check of $50,462.50 was to be deposited into a new account in the name of Your Airline at Bankers Trust Company, New York City, the funds to be used solely in payment of the airline tickets specified in the contract. It also provided that the $49,-600 check was to be deposited in a pre-existing bank account of the defendant, Your Airline, the funds to be used solely in furtherance of the other provisions of the October 6 contract. The agreement required that the funds in both accounts could not be disbursed except by checks signed by *Skolnick and* either Bosco or Crispo.

Despite this express provision for Skolnick's signature, checks were drawn against the accounts without his signature and the amounts thereof diverted, as noted hereafter. With respect to the pre-existing account at Bankers Trust, Bosco or Crispo never filed a corporate resolution with the bank for Skolnick's signature for withdrawals. As to the new account, although a proper resolution had been filed when it was opened, the requirement of Skolnick's signature on all checks was unilaterally eliminated. This was effected on October 28 by a corporate resolution of Your Airline signed by Crispo and "confirmed" by Bosco which changed the two signature requirement so that checks could be drawn on that account signed either by Bosco or Crispo. Skolnick never agreed to this change. In fact, neither he nor the plaintiff learned of it until several months after the event. Meanwhile, of the proceeds of plaintiff's checks that were deposited in the two accounts, considerable amounts were withdrawn to pay various obligations of Your Airline that were unrelated to the tour and personal expenses of individual defendants. One check, however, of which the payee was Air New England, was properly drawn with Skolnick's signature. Skolnick signed it upon the representation that the TWA tickets were being purchased through Air New England, which subsequent events show was false.

On November 1 Bosco informed the plaintiff at Paris that he was sending tickets for the group, which would be delivered on a TWA flight arriving in Paris. Although the tickets were carried from New York to Paris aboard a TWA flight, the tickets themselves were not for the TWA flight specified in the contract, but for two separate KLM flights. Moreover, although the KLM flights departed from Paris on the same day as the TWA flight, they left at different times: one several hours before the TWA flight was scheduled to depart, and one several hours later. Both KLM flights did not fly directly to New York, as the TWA flight did, and in order to use the KLM tickets the group would have to be

split in two. The tickets only provided transportation to New York and return to Paris: tickets for the domestic leg of the flight (between New York and Florida) were not included. Enclosed with the tickets was a note signed by Crispo requesting an additional $25,000 to cover the costs for the New York to Florida flights.

Promovoyage, because it was a weekend and Cartier did not have the home telephone numbers of the members of the group, was not able to notify them of the change in plans that required some of the group to arrive at the airport several hours earlier and others to arrive several hours later. Accordingly, Cartier had no choice but to obtain the necessary number of tickets on the contracted for TWA flight. This was fortuitous; when three members of the group were delayed, and it appeared that they would have to take a later plane, Cartier attempted to confirm three seats on the later KLM flight; however, KLM refused to honor or endorse the tickets over to TWA. Thus, Cartier was forced to purchase the TWA tickets outright, for which it paid $82,307.93 in cash, which included airfare between New York and Orlando.

When the group arrived in the United States, other problems were encountered. Although the contract had specified that the group would lodge at the Orlando Holiday Inn, the group was shifted to the Orlando Marriott, a hotel Cartier deemed inferior to the agreed upon hotel. The contract also required hotel arrangements to be prepaid, but Your Airline failed to do so. Indeed, the failure to prepay was the reason the Holiday Inn cancelled the reservations. While the group was at the Marriott, Crispo tendered a $5,000 check to the manager as a partial payment of the total bill. That check, however, was not covered by sufficient funds. This resulted in the harassment of the group by the hotel management, who at one point threatened to lock some members of the group out of their hotel rooms. After spending one day with

the group at the Marriott, and tendering the check described above, Crispo returned to New York, despite the contract provision that he would serve as a guide for the group for the entire tour.

As previously noted, the contract provided for excursions of the group to specific points of interest while in Florida. Payments for transportation to these sites, admission fees, and other items such as meals were to be made by Your Airline in advance, and group members were given vouchers to use in lieu of cash. Only the transportation fees had been prepaid, however, and the remaining vouchers were not accepted when tendered. Thus, Cartier also had to pay for these contracted for services.

While the group was still in Florida, Skolnick met with Jamie Wolfe, another attorney for Your Airline in New York, with respect to the problems that had developed in Florida. They reached an agreement on November 6 whereby Skolnick released the unused KLM tickets to Wolfe upon condition that they be held by him in escrow to obtain a cash refund from KLM, the proceeds of which were to be applied to the balance due the Marriott, and to any other outstanding unpaid account.

At a December 1980 meeting, the parties met again in New York. There Bosco and Crispo presented plaintiff with a final statement claiming that, because of various cancellation fees and other expenses, plaintiff owed defendants $99,549.50. The statement did indicate that plaintiff was owed $500 by defendants in refunds. Rather than effect an offset, Bosco tendered to Cartier a check in that amount.[5] Cartier refused the check, and instead brought this lawsuit.

The issues were sharply contested in a week long trial. The principal litigants testified either in person or by way of deposition. Other witnesses included Skolnick and Patrick Bruneau, who had participated in some of the New York negotiations on behalf of Promovoyage. Based upon the

---

5. In the light of the totality of Bosco's conduct, an inference is warranted that this was a manipulative attempt by Bosco, fully aware of his wrongful actions, to effect an accord and satisfaction.

Court's trial notes, which include its contemporaneous appraisal of each witness, a word-by-word study of Bosco's trial testimony, the demeanor of the witnesses and evaluation of their credibility, and the reasonable inferences to be drawn from established facts and surrounding circumstances, the Court concludes that plaintiff has established its breach of contract and fraud claims as against Crispo, Bosco and Your Airline.

The October 6 contract is clear and explicit. Equally clear is the defendants' breach of its various terms: the failure to (1) supply the TWA tickets; (2) secure lodging for the group at the Orlando Holiday Inn; (3) prepay the vouchers, and (4) their other breaches described above. It is beyond dispute that the essence of the contract was virtually eviscerated. In an attempt to absolve themselves from liability, the defendants, in reliance upon the testimony of Bosco, proffer a series of excuses for their breach of the agreement. The Court finds that Bosco was not a credible witness. He was glib and evasive with quick and ready answers, and did not hesitate to trifle with the truth. His testimony was marked by palpably evasive and irrelevant replies to critical inquiry. The excuses tendered by him fly in the face of the record. He claims, among other matters, that the TWA tickets were not obtained because plaintiff failed to supply a list of the full names and the gender of each member of the group and to tender payment for the tickets more than fifteen days before the group was to depart. This claim disregards the agreement of October 20, the clear purpose of which was to preserve the integrity, and to assure the defendants' performance, of the October 6 basic agreement. It dissolves in the face of repeated representations made thereafter by defendants to Skolnick and others up to six days before the tour was to depart that the TWA tickets had been purchased. His other explanations are patently frivolous and do not merit discussion. They are countered by the credible and believable testimony of Cartier, Skolnick, Bruneau and other witnesses.

Bosco's explanation of the change of bank resolutions which permitted the withdrawal of the funds from the two accounts without Skolnick's signature underscores his devious conduct. In addition to defeating the purpose of Skolnick's signature on the two bank accounts into which plaintiff's $100,062.50 had been deposited, Bosco thereafter engaged in other fraudulent conduct with respect to the escrow agreement of November 6, referred to above. Promovoyage had possession of 122 unused KLM tickets. They were delivered by Promovoyage to Jamie Wolfe, the attorney for Your Airline, under an escrow agreement which authorized Wolfe to release them to KLM for refund upon condition that the proceeds were to be applied solely to pay any outstanding debts due to the hotels in Florida and any other debts in connection with the tour, the balance of any refund to be retained by Wolfe and not disbursed except upon the written consent of Promovoyage's attorneys or an order of a court of competent jurisdiction. Despite the escrow agreement, Bosco received some $50,000, the refund for the tickets from KLM, and, except for a payment to one hotel, none of the proceeds of the refund was used for the purposes specified in the November 6 escrow agreement; instead, the balance of the proceeds, approximately $31,000, was used for his individual purposes or for the benefit of Your Airline for obligations unrelated to the tour. There is no explanation from Wolfe, who "disappeared," as to how it came about that in violation of his duty as escrowee he either delivered or permitted the cash refund to be turned over to Bosco and Your Airline. In sum, plaintiff has overwhelmingly established Your Airline's breach of the agreement of October 6 and is entitled to compensatory damages [6] in the following amounts paid by plaintiff when defendant defaulted: $82,307.93 for airline tickets; $2,645.30 for meals; $2,905.78 admission fees to various programs; and $160 for a sightseeing guide—a total of $88,-

---

6. *Worldwide Carriers, Ltd. v. Aris Steamship Co.,* 301 F.Supp. 70, 72 (S.D.N.Y.1969); *Hodes*

*v. Hoffman Int'l Corp.,* 280 F.Supp. 252, 258 (S.D.N.Y.1968).

019.01. So, too, plaintiff has fully established its claim of fraud against both Bosco and Crispo and is entitled to judgment against them in the same amount. The totality of the record abundantly establishes that Bosco and Crispo never intended in good faith to fulfill any of the agreements;[7] that they regarded them as mere scraps of paper;[8] that they intended to and did divert plaintiff's payment under the contract for their own or Your Airline purposes on obligations entirely unrelated to the contract with the plaintiff.

■ They aggravated their fraudulent conduct by the unilateral change of the two signature bank account agreement, which frustrated its purpose to assure performance of the October 6 agreement. The final fraudulent act was the violation of the express terms of the escrow agreement with respect to the refund of the KLM unused tickets, most of the proceeds of which were diverted and used contrary to the stated purpose for which the refund was to be used. The conduct and fraudulent acts of Bosco and Crispo can only be stamped as "outrageous and intentional misconduct" reflecting a "wanton disregard" of the rights of others.[9] The impact of the defendants' conduct had its effect not only upon the plaintiff, but also upon 125 innocent foreigners whose planned trip to our country became a harrowing experience.[10]

It warrants the imposition of punitive damages, which is allowed against each in the sum of $100,000, as well as against Your Airline in like amount.[11]

■ Plaintiff is also entitled to judgment against Wolfe, the attorney who violated the terms of the escrow agreement. He not only breached his fiduciary obligation to plaintiff as escrowee, but aided and abetted Bosco and Your Airline to obtain the KLM refund as a result of which $31,000 was diverted for purposes other than those specified in the escrow agreement. The sequence of events leaves no room to doubt that when he assumed his obligation under the agreement he had no intention of performing it. This is sufficient to cast him in liability to plaintiff for fraud.[12] So, too, his failure as a fiduciary to perform his duty also constitutes fraud.[13] Wolfe's unexplained conduct reflects a recklessness that betokens an improper motive and utter indifference to the rights of the plaintiff and others.[14] It warrants the imposition of punitive damages. The Court awards such damages in the amount of $31,000, which shall include any damages that plaintiff may have sustained as a result of Wolfe's breach of the escrow agreement.

■ Plaintiff seeks consequential damages for loss of business occasioned by de-

---

7. *See Deyo v. Hudson,* 225 N.Y. 602, 612–13, 122 N.E. 635 (1919); *Adams v. Gillig,* 199 N.Y. 314, 92 N.E. 670 (1910); *Brown v. Lockwood,* 76 App.Div.2d 721, 432 N.Y.S.2d 186, 194 (2d Dep't 1980). *See also Samuels v. Eleonora Beheer, B.V.,* 500 F.Supp. 1357, 1362 (S.D.N.Y. 1980), *aff'd on opinion below,* 661 F.2d 907 (2d Cir.1981).

8. With respect to the unilateral elimination of Skolnick's signature on the bank accounts, Bosco's explanation was: "We started to have problems with the normal account and the checking account, and we just changed the resolution. Trial Record at 52.

9. *Sharapata v. Town of Islip,* 56 N.Y.2d 332, 452 N.Y.S.2d 347, 349, 437 N.E.2d 1104 (Ct. Apps.1982).

10. *See Walker v. Sheldon,* 10 N.Y.2d 401, 223 N.Y.S.2d 488, 491, 179 N.E.2d 497 (Ct.Apps.

1961). *Cf. Brink's Inc. v. City of New York,* 546 F.Supp. 403 (S.D.N.Y.1982).

11. *See Doralee Estates, Inc. v. Cities Service Oil Co.,* 569 F.2d 716, 722 (2d Cir.1977) ("the test [for holding corporation liable for punitive damages] is whether the continuing tortious conduct has been brought home to the consciousness of relatively important managerial personnel with authority to make a decision for the corporation that would have prevented the damage").

12. *See* note 7, *supra.*

13. *Brown v. Lockwood,* 76 App.Div.2d 721, 432 N.Y.S.2d 186, 195 (2d Dep't 1980). *See also Gordon v. Bialystoker Center & Bikur Cholim, Inc.,* 45 N.Y.2d 692, 412 N.Y.S.2d 593, 596–97, 385 N.E.2d 285 (Ct.Apps.1978).

14. *See* note 9, *supra.*

fendants' conduct.[15] Plaintiff derived revenues in excess of $100,000 a year from Gaz de France, one of its principal customers. The disastrous experiences of the trip resulted in the loss of its patronage. Defendants were advised of and knew of the importance of Gaz de France to plaintiff, and the loss of that account was a reasonable and foreseeable consequence of defendants' breach. However, there is no showing that after a period of time plaintiff may not again obtain the patronage of its former customers. In this circumstance, the award against Your Airline, Bosco and Crispo is limited to its current loss at $100,000, which shall also include any damage sustained by loss of plaintiff's reputation in the travel tour business.

▪ Plaintiff also seeks reimbursement for legal fees paid to Skolnick in attempting to secure the defendants' adherence to the terms of the agreement. In the absence of a statute or an express agreement of the parties authorizing such payment, New York State follows the general American Rule that each party bears its own legal expenses incurred in litigation.[16]

▪ There remains for final consideration plaintiff's claims against Lia Bosco and Josephine Bosco, respectively the daughter and wife of Bosco who, as already noted, were also officers of Your Airline. Lia Bosco was also an officer, director and general manager of Medi Tours. The theory upon which plaintiff seeks to hold these individuals to liability is that when the $50,000 cash refund was received from KLM, they either were signatories upon checks that resulted in the diversion of $31,000 or played a role in effecting those or other diversions. However, the evidence does not support a claim of active participation in the wrongful conduct of the other individual defendants. Moreover, the fact that

Medi received some of the funds derived from the KLM refund and were used to meet Your Airline obligations for the Florida hotels does not establish the plaintiff's charge against these individual defendants. So, too, the fact that the Medi books and records were not produced is not sufficient to permit an inference that they, too, were wrongdoers. There is no proof that the books and records were under the control of these defendants or that they were responsible for their nonproduction. Plaintiff has failed to sustain its burden of proof with respect to them.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

Judgment may be entered accordingly.

---

**15.** See, e.g., *Ernesto Foglino & Co. v. Webster,* 244 N.Y. 516, 155 N.E. 878 (1926); *Wright v. Bank of Metropolis,* 110 N.Y. 237, 18 N.E. 79 (1888); *Hadley v. Baxendale,* 156 Eng.Rep. 145 (1854). See also *Harbor Hill Lithographing Corp. v. Dittler Bros., Inc.,* 76 Misc.2d 145, 348 N.Y.S.2d 920 (Sup.Ct., Nassau Co. 1973) (UCC 2–715).

**16.** *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Green v. Potter,* 51 N.Y.2d 627, 435 N.Y.S.2d 695, 696, 416 N.E.2d 1030 (Ct.App. 1980); *Lewis v. S.L. & E., Inc.,* 629 F.2d 764, 773 (2d Cir.1980).